**YONKERS RACEWAY, Inc., Plaintiff,**

v.

**STANDARDBRED OWNERS ASSOCIA-TION, Inc., Francis P. Smith, Arthur J. Brown, Russ C. Carpenter, William R. Haughton, John P. Simpson, Stanley F. Dancer, Joe O'Brien, Delvin Miller, Hugh A. Bell, Edward Cobb, William M. Myer, James W. Jordan, Franklin Sanford, Wendell Wathen, Percy Gray, Morris Pivnick, Sanders Russell, Morris MacDonald, Edward Dougherty, Al Karet, Henry Critchfield, Defendants.**

United States District Court
S. D. New York.
July 8, 1957.

Bleakley, Platt, Gilchrist & Walker, New York City, for plaintiff, Chapman, Walsh & O'Connell and Charles M. Metzner, New York City, of counsel.

Donovan, Leisure, Newton & Irvine, New York City, for defendants, Breck P. McAllister, James V. Hayes, Sidney P. Howell, Jr., and Samuel W. Murphy, Jr., New York City, of counsel.

DAWSON, District Judge.

This is a motion for a preliminary injunction pending trial in which plaintiff seeks an order enjoining the defendants, their agents, servants or employees, from failing in concert to enter horses in the races scheduled to be held at Yonkers Raceway on June 14, 1957 and thereafter, and from refusing in concert to drive their horses or the horses owned by members of the defendant Association in said races, and from otherwise impeding, obstructing or interfering, by any act or failure to act, with the conduct of said races.

The complaint alleges violations of §§ 1 and 2 of the Sherman Act. 15 U.S.C.A. §§ 1, 2.

The action is one brought under the anti-trust laws for an injunction and damages. 15 U.S.C. §§ 15, 26.

The moving papers establish without substantial dispute:

1. The plaintiff is a New York corporation which since April 1950 has conducted harness horse racing, accompanied by pari-mutuel betting, at Yonkers Raceway at Yonkers, New York, and has a substantial investment in such raceway.

2. Under the New York laws relating to pari-mutuel betting (McKinney's Un-

consolidated Laws, § 7603) plaintiff is required to deduct 15% from the pari-mutuel pool and the balance of the pool is paid to the holders of winning tickets. Out of the 15% a certain proportion is paid to the State of New York as tax and the balance is retained by the plaintiff. The plaintiff also derives additional revenue from admission charges, parking fees and concessions. From the money retained by the plaintiff from the pari-mutuel pool it pays certain amounts to the owners of the horses participating in the races, usually proportioned to the success or lack of success in winning the respective races.

3. The defendant Association is a membership corporation organized in 1951 under the laws of the State of New York and has a membership of approximately 450 owners and drivers of harness horses. The members of the Association engage in the business of owning, training and driving harness horses at Yonkers Raceway and at various other harness tracks and fairs in the State of New York and elsewhere. It is alleged that the membership of the Association includes 90% of the owners and drivers engaged in harness racing in the New York City metropolitan area.

4. The defendant Smith is the president and a director of the Association. The other individual defendants are members of the Association and are either directors of the Association or owners or drivers of harness horses.

5. The activities of harness racing are activities in interstate commerce in that the horses, in going from track to track, go across state lines.

6. Prior to the formation of the Association in 1951 the practice was that in advance of the opening of a race meeting the plaintiff advertised its proposed purse schedule and the drivers and owners electing to compete for the purses filed applications for stall space and thereafter entered their horses in the races and competed for the purses offered. At that time the purses were approximately 18% of the sums retained by the plaintiff out of the pari-mutuel pool.

7. In 1954 the plaintiff entered into negotiations with the Association with reference to the amounts of these purses. As a result of these negotiations the parties entered into a contract by which plaintiff agreed to pay purses totaling 35% of the amount retained by the track out of the pari-mutuel pool. This contract ran for a period of three years from May 25, 1954.

8. Prior to the opening of the Spring, 1957 meeting at Yonkers Raceway, plaintiff advertised that it intended to continue its 35% purse policy. The track distributed applications for stall space which in part provided that the owners and drivers occupying stall space would agree to race for purses of the amount offered. A number of the members of the Association executed such applications.

9. In May 1957 defendant Smith, as president of the Association, and the Board of Directors of the Association demanded that the purses be increased from 35% to 45% of the sums retained by the plaintiff out of the pari-mutuel pool. At a meeting of the members of the Association on June 1, 1957 a Committee of three was appointed as a negotiating delegation to represent the Association and its members in connection with this and other demands. When the plaintiff refused to accede to these demands another meeting of the members of the Association was held on June 6, 1957. The members voted unanimously to stand by their proposals as previously submitted and instructed the Committee to notify the plaintiff that the members of the Association would not enter horses for racing at Yonkers Raceway after 6 p. m. on June 9, 1957.

10. In the June 12, 1957 issue of "The Harness Horse," a magazine with a circulation among horse owners and horse riders, the defendant Association caused a full page advertisement, reading as follows, to be inserted:

"Notice

"To All Horsemen * * *

"The Standardbred Owners Association, which represents horse owners, trainers and drivers who race at Yonkers Raceway, after futile attempts to negotiate with the management of Yonkers Raceway, have served notice of a suspension of racing at Yonkers Raceway, effective Friday, June 14, 1957 in accordance with the rules and regulations of the U. S. T. A. and the New York Harness Racing Commission.

"We Horsemen At Yonkers Raceway Urgently Request That You, Our Fellow Horsemen, Do Not Ship Any Horses To Yonkers Raceway Until We Have Resolved Our Differences With Yonkers Raceway and Have Agreed On a Formal Contract Covering Racing Activities At Yonkers Raceway.

"Standardbred Owners Association
"Francis P. Smith,
"President."

On June 13, 1957 the present action was started in this Court and on the same day a motion was made for a temporary injunction and for a stay until determination of the motion. The stay was granted by Judge Levet and racing has continued at Yonkers Raceway.

■ The plaintiff contends that the action of the defendants is such that it constitutes an illegal boycott designed to force the plaintiff to increase the amount of the purses offered for racing at the Yonkers Raceway, and hence is an illegal conspiracy to fix prices. The only issue now before the Court is whether the injunction pendente lite should be granted. The remedy of a preliminary injunction is a drastic one. It should not be granted unless the Court is convinced with reasonable certainty that the moving party will succeed at the trial of the action. Furthermore, such remedy will generally not be granted where there are doubtful issues of fact which may determine the result.[1]

■■ Price-fixing by a combination or conspiracy is illegal per se. See Union Circulation Co. v. F. T. C., 2 Cir., 1957, 241 F.2d 652. The result of applying this rule to the matter in controversy turns on the meaning of the terms conspiracy and combination as well as upon what is required to prove their existence. Several specific questions present themselves. May over 100 independent horse owners collectively negotiate with the track as to its purse policy? May the horse owners appoint a bargaining representative, such as the Association, to represent them in these negotiations? And if no agreement can be reached with the track, can the horsemen independently refuse to race?

To answer these questions in the negative would extend the Sherman Act far beyond its original purpose. On one side of the controversy is a race track which by the laws of New York (McKinney's Unconsolidated Laws, § 7598) has been given a monopoly on harness horse racing at a particular locality. On the other side of the controversy are hundreds of individual owners of horses who are extended the privilege of racing their horses at that track and of competing for purses. Many of these individuals have been represented in negotiations with the track by the defendant Association. With a group of entrepreneurs on one side and a powerful single corporation on the other side, there would appear to be nothing illegal in that group of individuals having a single agent to represent them in any negotiations. The Association has urged that larger purses be offered to the horse owners. The raceway had refused to

1. See Huber Baking Co. v. Strochmann Bros. Co., D.C.S.D.N.Y.1953, 114 F. Supp. 411; affirmed, 2 Cir., 208 F.2d 464; Federal Telephone & Radio Corp. v. Federal Television Corp., 2 Cir., 1950, 180 F.2d 250; Atlantic & Gulf West Coast, etc., v. United States, D.C.S.D. N.Y.1950, 90 F.Supp. 554; Margolis v. Franks, D.C.S.D.N.Y.1956, 138 F.Supp. 9.

consider increasing the purses. Is this Court empowered under the circumstances to direct that the horse owners must continue to race their horses at the track for the purses offered by the track? For the Court to so direct would mean that each individual horse owner must negotiate separately with the track,[2] or that if the horse owners negotiate through a common agent and the agent advises that he is unable to reach a satisfactory agreement with the track, that the horse owners then may not individually determine to abide by their agent's recommendation not to enter the races for the purses offered by the track. The Sherman Act does not sanction such prohibition against individual action.

■■ There is presented on the papers a distinct issue of fact as to whether the horse owners have in fact entered into a combination, agreement or conspiracy not to race horses at Yonkers Raceway, or whether on the other hand, the horse owners decided, as a result of the refusal of the track to negotiate an increase in the purses, that they would in their individual judgment refuse to race under the terms offered. In other words: Is there a combination or conspiracy between the defendants themselves to boycott the track whereby each has bound himself to his fellow-horsemen not to enter horses at the track, or is it a situation where many horse owners have each individually determined not to race his horses? People may certainly reach the same conclusion without having entered into a contract or conspiracy. If, for example, the Association reported to a number of its members that the race track arbitrarily refused to discuss or consider an increase in purses offered, and if as a result of this report a number of the

members unanimously stated that they would not race their horses at the track, the members may be acting in a common manner but this does not necessarily prove that they have entered into an illegal combination, contract or conspiracy with each other not to race horses. The difference is this: Did the defendants agree with each other that they would not race horses, or did they, without any such agreement inter se, separately reach a determination at the same time to reject the terms offered by the track and to take their horses home or to another track? It does not appear that the anti-trust laws prohibit competitors from reaching the same conclusion; rather they apply where the parties between themselves have entered into an agreement or combination to boycott or refuse to do business with another party to the dispute. Whether the individual defendants have acted or now threaten to act in concert is a question as to which the moving papers are insufficient to justify a preliminary injunction. Accordingly, until this issue of fact is fully litigated at trial, no provisional action by the Court is appropriate.

■ The primary items of proof relied upon by the plaintiff are that the individual horsemen unanimously voted to withdraw, and that the Association advertised in a nationally distributed trade publication requesting other horse owners not to race at the Yonkers Raceway. Upon analysis, the fact that individual horsemen were unanimously determined to withdraw is not under the circumstances of sufficient value to establish that this was the result of a combination or conspiracy. It must be contrasted with a situation where, for example, the majority favored withdraw-

2. Plaintiff has construed part of defendants' Answer as expressing an admission of guilt. Paragraph 27 of the Answer asserts that "collective negotiation" is necessary on the part of the horse owners if they are to negotiate effectively with the track. Irrespective of the truth of this allegation it does not constitute an admission of illegal conduct in concert, but is merely a statement that instead of 100 horse owners sitting down with the track, the appointment of a delegation is a more efficacious technique. Furthermore, collective bargaining does not necessarily infer an agreement precluding an individual from acceding to terms he deems acceptable.

al and the minority favored continued racing, and despite the divergence, all followed the majority will and withdrew. That would be a case of concerted activity, and differs from the facts in the present controversy where there has been no proof that any horse owners have withdrawn contrary to their own inclination and determination. The activity of the Association, on the other hand, is clearly culpable. The advertisement it directed to horse owners around the nation was an unequivocal attempt to precipitate a classic form of secondary boycott. Accordingly, injunctive relief against the Association is, under the circumstances, merited. See Metropolitan Bag & Paper Distributors Ass'n v. F. T. C., 2 Cir., 1956, 240 F.2d 341 (injunction issued against Association but not against members who did not participate in illegal conspiracy).

The Court therefore concludes that it would not be desirable or proper at this time, on the papers submitted, to issue a temporary injunction in the form sought by the plaintiff, and said motion for a temporary injunction is denied and the stay vacated. The Court directs, however, that an injunction pendente lite issue prohibiting the defendant Association, its officers, agents and servants from endeavoring to induce owners of harness horses not to ship horses to the Yonkers Raceway or not to race horses at the Yonkers Raceway.

In reaching this determination the Court is mindful of the fact that the controversy here involved is an economic dispute. In the long run the success of harness racing in this State can only be achieved by a certain degree of cooperation between the race tracks and the owners of the horses which are to race at those tracks. To use the strong arm of the Court to enforce terms on either side would not lead to long-term good relations between the parties or the success of this sport. The Court has sought to bring the parties together on a basis of mutual discussion in an endeavor to reach a satisfactory settlement of the controversy. The arbitrary attitude of the plaintiff has made such efforts fruitless. Plaintiff seems to have taken the position that it wishes to negotiate with the horse owners under the aegis of a Court injunction which would in effect deprive the other parties of real bargaining power. This may be a legalistic approach but it is not a realistic approach to a very practical problem. The controversy easily could be brought to a conclusion satisfactory and profitable to both sides if on both sides there was a desire to reach a fair determination. That desire up to now seems missing.

The Court concludes:

1. Plaintiff has not established to the Court's satisfaction that the actions of the individual defendants were the result of or evidenced a combination or conspiracy to violate the anti-trust laws.

2. Plaintiff has established that the defendant Association and the defendant Smith did in unison seek to induce horse owners to refrain from racing horses at the Yonkers Raceway, and that this was an attempt at a boycott of this track to compel the track to pay a higher price to the horse owners for racing at the track; that such action would be an attempt at an illegal boycott which would be in violation of the anti-trust laws; and for which plaintiff has no adequate remedy at law.

3. That an injunction pendente lite should issue restraining the Association and defendant Smith and the officers, directors and agents of the Association from endeavoring directly or indirectly to induce owners of horses not to ship them to Yonkers Raceway or not to race them at Yonkers Raceway.

4. That except as hereinabove provided the motion for a temporary injunction should be denied and the stay vacated.

This opinion shall constitute the findings of fact and conclusions of law of the Court.

Submit decree on or before July 11, 1957.