JOHN J. & WARREN H. GRAHAM, a partnership

v.

TRIANGLE PUBLICATIONS, INC.

No. 35102.

United States District Court
E. D. Pennsylvania.
Aug. 21, 1964.

White & Williams, W. Wilson White, Michael H. Malin, Philadelphia, Pa., for plaintiff.

Dilworth, Paxson, Kalish, Kohn & Dilks, Wm. T. Coleman, Jr., Harold E. Kohn, Philadelphia, Pa., for defendant.

HIGGINBOTHAM, District Judge.

This is an action for preliminary injunction instituted by plaintiffs, John and Warren Graham, suburban-Philadelphia newsdealers, seeking to enjoin defendant, Triangle Publications, Inc. (Triangle), owner and publisher of The Philadelphia Inquirer, from refusing to sell the Inquirer to plaintiffs, and alleging, inter alia, that Triangle's refusal

to deal is prohibited by Section 1 of the Sherman Act.[1]

Triangle, on the other hand, filed a counterclaim against plaintiffs, joining 13 other suburban newsdealers [2] and the association to which they belong,[3] as counterdefendants, alleging, inter alia,[4] that these counterdefendants conspired at a series of meetings to fix the resale price of the Inquirer in violation of Section 1 of the Sherman Act. Although Triangle is not seeking injunctive and treble damage relief at this stage, evidence on this issue has bearing upon whether plaintiffs have come into equity with "unclean hands." Triangle also has moved to dismiss plaintiffs' complaint for failure to state a cause of action.

My findings of fact for the purposes of this preliminary injunction are as follows: [5]

The Inquirer, which is published in Philadelphia, is a morning newspaper carrying national and world-wide news and has a circulation of over 500,000 daily copies and over 900,000 Sunday copies. Its circulation includes substantial numbers of copies distributed in the states of New Jersey, Delaware, Maryland and the District of Columbia. Triangle has approximately 250 suburban newsdealers distributing Inquirers in Bucks, Chester, Delaware and Montgomery Counties in Pennsylvania, and Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer and Salem Counties in New Jersey, and Newcastle County in the state of Delaware.

Plaintiffs, John and Warren Graham, are partners in a news route in the Villanova-Rosemont area of suburban Philadelphia where they delivered newspapers to home subscribers and stores. Plaintiffs served 900 Inquirers daily and approximately 100 New York papers, including the New York Times and Herald Tribune. In delivering newspapers, plaintiffs used two trucks and various tying and wrapping equipment which they own. In addition to the work done by themselves they had one full-time employee to assist them.[6] They operate from plaintiff John Graham's home. Under the arrangement that plaintiffs and many other newsdealers had with Triangle, they purchased newspapers for resale from the defendant and were permitted to return the newspapers they did not sell and receive credit for them. Plaintiffs charged a weekly service fee ranging from ten cents to fifty cents per customer, with an average of approximately twenty cents, depending upon the amount of service required by the individual account.[7] It is this service charge which is the subject of the present controversy.

At least as early as February 1958, the imposition of service charges by carriers was a matter of concern to Triangle. At that time Triangle's policy was to require *new* carriers to sign an agreement on a form supplied by it

[1]. The claim for injunctive relief is brought under the provisions of 15 U.S.C. § 26. Plaintiffs also seek treble damages for injuries to their business under 15 U.S.C. § 15, and further assert that Triangle violated the monopoly provisions of Section 2 of the Sherman Act. 15 U.S.C. § 2. However, the monopoly and treble damage claims are not being pressed at the preliminary injunction stage.

[2]. For the purposes of this Opinion, the terms "newsdealer" and "carrier" will be used interchangeably.

[3]. Delaware Valley News Dealers Association.

[4]. The counterclaim also alleges boycott and other coercive conduct on the part of counterdefendants. However, in view of the paucity of evidence on this issue, the Opinion shall only deal with the alleged price-fixing conspiracy.

[5]. Since these findings are based only upon the testimony and exhibits adduced in the three-day hearing for preliminary injunction, it is possible that they may be changed upon the full development of facts at the hearing for final injunction.

[6]. There was also testimony that Warren Graham's wife acted as secretary in answering the phone and taking messages.

[7]. The amount of the service charge depended upon the distance between houses on the route and on whether it was necessary to drive up a private entrance to deliver the paper.

stating that they would not charge a price for the paper in excess of that established by Triangle. This policy was discontinued shortly afterwards, and instead, Triangle went "along with [a] five cents a week delivery charge on the daily papers * * * " [8] until September 30, 1963, when it raised the daily Inquirer from five to eight cents a copy.[9]

The retail price increase to eight cents was accompanied by notices to all of Triangle's carriers stating:

"The daily home delivery price * * * becomes 48¢ per week [for six dailys a week]. Under this price structure, we will not supply the newspaper for resale by any carrier who adds a service charge to that figure." [10]

These notices were followed by periodic statements in the masthead of the Inquirer that the daily home delivered rate is 48¢ per week.

After the notices to discontinue service charges were sent to the carriers, the enforcement policy of Triangle, as stated by Morris J. Schiffman, Circulation Director of the Inquirer, was that no action was to be taken against noncomplying carriers unless a complaint was made by one of the subscribers on his route. When a complaint was received, the carrier was then told by Mr. Schiffman, or one of his subordinates, that he would be "cut off" unless he submitted a written statement that he would eliminate the service charge. However,

Triangle took no independent action to ascertain whether service charges were being imposed by the carriers.

In response to demands by representatives of Triangle, at least seven carriers gave such statements after being told that their supply of Inquirers would be discontinued.[11]

Around the same time as Triangle announced its policy on service charges, a group of suburban carriers began meeting on a regular basis under the auspices of an organization known as the Delaware Valley News Dealers' Association. The first meeting was held in New Jersey at which plaintiff, John Graham, director and treasurer of the Association, spoke and at which Robert E. Davidson, one of the counterdefendants, presided. There were about seven of these meetings which were attended by as many as fifty carriers, some of whom were from New Jersey. One of the major—although not sole—subjects of discussion at these meetings was service charges.

Plaintiff, John Graham, testified that the carriers, including himself as an active leader of the Association, agreed at these meetings that where they previously imposed a service charge, they would continue to make such charge. The suburban carriers also raised a legal fund of $6500 at these meetings to assist the first man whose supply of Inquirers was discontinued.

After receiving numerous complaints from subscribers about plaintiffs' service

8. Testimony of James Rinehimer, suburban circulation manager of the Inquirer. Record, at pp. 47–48, hearing of June 4, 1964.

9. The price of the Inquirer was later raised to ten cents per daily copy after this litigation began and therefore has no bearing upon the motion for preliminary injunction now under consideration.

10. These were two notices: the first notice was dated September 20, 1963, and the second notice was dated November 20, 1963.

11. These statements were given by John S. King, a New Jersey carrier, on November 2, 1963; J. Ralph Myers and

Millard C. Kanzinger on November 5, 1963; James O'Neill on November 14, 1963; Joseph Miller on November 20, 1963; John N. McKalvey on January 24, 1963; Robert Griffiths on February 11, 1964.

Counsel for Triangle contends that these statements were given in connection with litigation then pending in the state courts which was instituted by city carriers. See Woehr v. Triangle Publications, —— D & C —— (1963), affirmed per curiam 414 Pa. 653, 201 A.2d 432 (1964). None of these statements mention the state litigation and no nexus to that litigation was established by counsel for Triangle during his cross-examination of the writers of these letters.

charges, representatives of Triangle personally informed plaintiffs on February 13, 1963, and again on February 17, 1963, that unless they agreed to eliminate these charges they would be "cut off." Plaintiffs refused to agree and on February 18, 1964, Triangle stopped selling newspapers to the plaintiffs and have continuously refused to deal with them up to the present time. This refusal to deal was occasioned solely by the failure of plaintiffs to adhere to Triangle's announced resale price policy. On the same day, Triangle began establishing its own distribution system to the subscribers in the areas formerly serviced by plaintiffs so that the subscribers are now being served by Triangle's employees at a home delivery rate of 48¢ per week. This suit was instituted on February 18, 1964, immediately after the occurrence of the above described events.

Before turning to the difficult questions raised in this litigation, I find preliminarily that the allegedly unlawful conduct of both Triangle and the counter-defendants involves and has a substantial effect upon interstate commerce. See Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3rd Cir. 1963).[12]

At this stage of the proceedings the Court is governed by the familiar rule that a preliminary injunction should be viewed with caution and only granted in those clear cases where there is a substantial probability of eventual success.[13] Thus, " * * * where difficult questions of law and fact are in dispute * * * it is established law of this District and Circuit that a preliminary injunction will not issue * * *." Clifton Park Manor, Section One, Inc. v.

Mason, 137 F.Supp. 324, 325 (D.Del. 1955).[14] Accordingly, it has been said that " * * * to doubt is to deny." Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3rd Cir. 1937). I have doubt in this case.

The major issues are: (1) whether, apart from the statements obtained from the seven carriers, Triangle's refusal to deal with plaintiffs in pursuance of its resale price policy falls within the protection of the Colgate doctrine; and (2) whether because of Triangle's solicitation of the aforementioned statements, plaintiffs are clearly entitled to an injunction under 15 U.S.C. § 26 where the law is uncertain as to the defenses of unclean hands and McGuire Act exemption; and (3) whether plaintiffs will suffer irreparable injury if a preliminary injunction is not granted.

I

UNILATERAL REFUSAL TO DEAL

Apart from the statements received from the carriers which I shall discuss in the next section, I find that Triangle's resale price policy was maintained and enforced within the permissible bounds of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) and United States v. Parke Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed. 2d 505 (1960).

Colgate held that unless an express or implied agreement between a manufacturer and dealer exists, a manufacturer can enforce its resale price policy by refusing in sell to noncomplying dealers. This doctrine has been narrowed over the years by cases which involved more than a bare refusal to deal.

Thus in Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42

12. Counsel for Triangle conceded that for the purposes of preliminary injunction a sufficient contact with interstate commerce exists. Record, pp. 49–51, hearing of February 20, 1964.

13. Murray Hill Restaurant, Inc. v. Thirteen Twenty One Locust, Inc., 98 F.2d 578 (3rd Cir. 1938); Barker Painting Co. v. Brotherhood of Painters, Decorators, and Paperhangers of America, 15

F.2d 16 (3rd Cir. 1926); Dallas v. Atlantic Refining Co., 189 F.Supp. 815 (D.Del.1960) ; Yonkers Raceway v. Standardbred Owners Ass'n., Inc., 153 F. Supp. 552 (S.D.N.Y.1957).

14. See also Aig Schechner, Inc. v. Aig, 1950–51 Trade Cases § 62,711 (D.C.N.Y. 1950); Oneida Community Limited v. Fouke Fur. Co., 286 F. 757 (D.Del. 1923).

S.Ct. 150, 66 L.Ed. 307 (1922), Beech-Nut refused to sell to wholesalers who sold to price-cutting retailers. To detect violators Beech-Nut utilized code numbers on its products and had numerous agents reporting on retailers.

In United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1943), the Court found a violation of the Sherman Act when defendant refused to sell to wholesalers who sold to retailers other than those who were approved by defendant (i. e., retailers who adhered to the published retail price list).

And finally in United States v. Parke Davis, supra, the Court departed from the requirement of finding an express or implied agreement to maintain prices, as enunciated in the earlier cases, and held that Parke Davis' "refusal to deal with * * * wholesalers in order to elicit their willingness to deny Parke Davis products to [price-cutting] retailers" was a combination and conspiracy in restraint of trade within the meaning of Section 1 of the Sherman Act. (362 U.S. at 45, 80 S.Ct. at 512.) The Court in Parke Davis did not overrule Colgate, but only amplified the type of conduct beyond a simple refusal to deal which would be deemed unlawful.

■ All of the cases cited by plaintiffs on this issue, including the cases cited above,[15] involve facts of a conspiracy or combination between a producer and his distributers to boycott or refuse to deal with certain designated third persons and, in some cases, a system of spying or active policing to ascertain noncomplying retailers. In the instant case, there is no allegation nor evidence of any combination or conspiracy to boycott any third persons, and though there is an allegation in the complaint of spying,[16] plaintiffs have failed to prove this conduct. Absent these elements, Triangle's actions consist of no more than a simple unilateral refusal to deal which falls within the permissible limits of the Colgate case, supra, and the Third Circuit case of Klein v. American Luggage Works, Inc., 323 F.2d 787 (3rd Cir. 1963).

## II

## DEFENSES TO CLAIMED ILLEGALITY OF THE SEVEN AGREEMENTS

Assuming without deciding that the seven agreements which Triangle obtained from the carriers are illegal and invalidate its resale price setting scheme,[17] Triangle raised defenses involving cloudy areas of antitrust law on which there is not yet any final authority and which cast doubt on plaintiffs' case.

First, plaintiffs contend that the seven agreements fall within the McGuire Act exemption to the antitrust laws. Section 2 of that Act provides:

"Nothing * * * in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing *minimum or stipulated* prices * * * of a commodity which bears * * * the trademark, brand, or name of the producer * * * of such commodity * * * when contracts or agreements of that description are lawful as applied to interstate transactions under any statute * * * in effect

15. See e. g., Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961); Walker Distributing Co. v. Lucky Lager Brewing Co., 1963 Trade Cases § 70886 (9th Cir. 1963); Airfix Corp. of America v. Aurora Plastics Corp., 1963 Trade Cases § 70939 (E.D.Pa.1963).

16. In paragraph 7 of plaintiffs' complaint, it is averred that "[d]efendant also illegally used agents to conduct investigations of the resale prices charged by the carriers and to report instances of nonconformance to defendant's prices."

17. See United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S.Ct. 251, 64 L. Ed. 471 (1920); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). The fact that these agreements establish maximum rather than minimum prices does not lessen the possible market restraint. See Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

in any State." 15 U.S.C. § 45(a) (2). (Emphasis added.)

And section 1 of the Pennsylvania Act similarly exempts agreements from the antitrust laws which provide "[t]hat the buyer will not resell such commodity, except at the price *stipulated* by the vendor." (Emphasis added.) Act of June 5, 1935, P.L. 266, § 1, as amended, 73 P.S. § 7. The textual argument is thus made that these two acts do not merely exempt minimum price agreements but also exempt "stipulated" price agreements, including the instant agreements which stipulate that the carriers would charge no more than forty-eight cents per week.

Since this is a rather novel contention, there are no cases precisely in point. However, in Mead Johnson & Co. v. West Chester Discount Health & Vitamin Center, Inc., 212 F.Supp. 310 (E.D.Pa. 1962), then District Court Judge Freedman alluded to the present situation when he said: "Indeed, it may well be said that the fixing of a minimum retail price is an exercise of some, but not all, of the authority conferred by the statutory right to set a *stipulated price*." (212 F.Supp. at 313). (Emphasis added.) It should also be mentioned that the Miller-Tydings Amendment [18] only used the phrase "minimum prices." It would therefore seem that the later addition of the words "stipulated price" was intended by Congress in the McGuire Act to mean something more than a minimum price.[19]

■ Section 1 of the Pennsylvania Act, here relied on, is still in force since the Supreme Court of Pennsylvania only declared the non-signer clause of Section 2 [20] unconstitutional in Olin-Mathieson Chemical Corp. v. White Cross Stores, Inc., 414 Pa. 95, 100, 199 A.2d 266 (1964). In the White Cross case the Pennsylvania Supreme Court was concerned with the improper delegation of power to private persons, a problem which does not exist under Section 1, which declares lawful vertical agreements between producer and vendor. Until the state courts also declare Section 1 of the Pennsylvania Act unconstitutional it still remains on the books and must be applied as written. Again it should be remembered that a final interpretation of the Federal and Pennsylvania Acts is not required at this stage. I only mention the above considerations to indicate the uncertainty in the law and the reasons for the "doubt" that I have.[21]

■ Next, there is the contention that the agreement of plaintiffs with the other carriers attending the meetings of the Delaware Valley News Dealers Association to continue to impose service charges constitutes an illegal price-fixing conspiracy and, as such, plaintiffs' unclean hands bar them from obtaining a preliminary injunction under § 16 of the Clayton Act. (15 U.S.C. § 26.) However, plaintiffs maintain that the unclean hands defense no longer exists in antitrust suits, citing as authority Kiefer-Stewart v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) and Moore v. Mead Service Co., 340 U.S. 944, 71 S.Ct. 528, 95 L.Ed. 681 (1951).[22]

18. 15 U.S.C. § 1.

19. Mead Johnson & Co. v. Chester Discount Health & Vitamin Center, Inc., 411 Pa. 377, 192 A.2d 364 (1963), cited by plaintiffs, involved a suit to prevent the selling of the manufacturer's products at less than the contract price and not more than the agreed price as is present here. Thus, the Court in that opinion was addressing its remarks to an entirely different problem.

20. Act of June 5, 1935, P.L. 266, § 2, 73 P.S. § S.

21. At the hearing for final injunction, it will be necessary to show that Triangle's products are in "fair and open competition" and that Triangle is not competing with the newsdealers from whom it obtained these agreements. See Schering Corp. v. Martin Wholesale Distr. Inc., 212 F.Supp. 325 (E.D.Pa.1962); and United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L. Ed. 1209.

22. Reversing per curiam, 184 F.2d 338 (10th Cir. 1950).

In the Kiefer-Stewart and Moore cases, the Supreme Court did not permit the unclean hands defense to be interposed in actions at law for treble damages under 15 U.S.C. § 15. There is no question that the scope of the *pari delicto* or unclean hands defense has been limited by the above-cited cases [23] and that the District Courts are divided on whether the Kiefer-Stewart and Moore cases should be extended to deny the defense in suits for injunction under 15 U.S.C. § 26.[24]

Although the Third Circuit has in the past honored the defense in a private suit for injunction instituted under the antitrust laws (Singer v. A. Hollander, 202 F.2d 55, 59 (3rd Cir. 1953)), it did not rely on the defense as the sole reason for dismissing the suit. If the unclean hands defense was the most persuasive argument for denying an injunction which should otherwise issue I would be inclined to hold under the facts and circumstances of this case that it would not be enough to thwart relief.[25] However, the scale tips against granting the extraordinary remedy which plaintiffs seek when the absence of a clear appellate precedent precluding the unclean hands defense in private antitrust injunction proceedings is combined with the other previously mentioned uncertainties in the law.

III

NO IRREPARABLE INJURY

■ Plaintiffs' case fails in still another respect. Since plaintiffs have the burden of proving that they will suffer irreparable injury,[26] it is necessary for them to establish that they do not have an adequate remedy at law for damages and that their losses are incapable of definite measurement. See Henis v. Campania Agricola De Guatemala, 116 F. Supp. 223 (D.C.Del.1953), aff'd. per curiam, 210 F.2d 950 (3rd Cir. 1954); Hershel California Fruit Products Co., Inc. v. Hunt Foods, Inc., 111 F.Supp. 732 (S.D.Cal.1953); Fein v. Security Banknote Co., 157 F.Supp. 146 (S.D.N.Y. 1957). This they have failed to do.

23. But see Pennsylvania Water & Power Co. v. Consolidated Gas Electric Light & Power Co. of Baltimore, 209 F.2d 131 (4th Cir. 1953), cert. den., 347 U.S. 960, 74 S.Ct. 709, 98 L.Ed. 1104 (1954). In this case, occurring after Kiefer-Stewart, the Fourth Circuit permitted the defense to be raised in a treble damage antitrust action where the plaintiffs and defendants were parties to the same conspiracy.

24. Compare Hotel Phillips, Inc. v. Journeymen Barbers, 195 F.Supp. 664 (D.C.Mo. 1961), aff'd, 301 F.2d 443 (8th Cir. 1962); Lehmann Trading Corp. v. J. & H. Stolow, Inc., 184 F.Supp. 21 (S.D.N.Y. 1960) with Noerr Motor Freight, Inc. v. Eastern Railroad Presidents Conference, 155 F.Supp. 768 (E.D.Pa.1956), aff'd, 3 Cir., 273 F.2d 218, rev'd, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1960); Interborough News Co. v. Curtis Publishing Co., 108 F.Supp. 768 (S.D.N.Y.1952); Trebuhs Realty Co., Inc. v. News Syndicate Co., Inc., 107 F. Supp. 595 (S.D.N.Y.1952).

There may be significant distinction between the treble damage provisions of 15 U.S.C. § 15—under which the Kiefer-Stewart and Moore cases were decided— and the injunction provisions of 15 U.S.C. § 26. The treble damage provision makes no reference—either directly or indirectly—to such defense, whereas 15 U.S.C. § 26 very pointedly refers to the prior rules and principles of equity, of which the unclean hands doctrine has been a traditional mainstay. The injunction provision of 15 U.S.C. § 26 provides in pertinent part that:

"[a]ny person * * * shall be entitled to * * * injunctive relief * * * against threatened loss or damage * * * of the antitrust laws * * *, *when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings * * *.*" (Emphasis added.)

25. See Gaudiosi v. Mellon, 269 F.2d 873 (3rd Cir. 1959), a non-antitrust case in which the court stressed the broad discretion that the equity court has in applying the unclean hands doctrine.

26. Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569, 574 (3rd Cir. 1959); Sims v. Greene, 161 F.2d 87, 89 (3rd Cir. 1947).

Although the value of a major news route in this specific locality cannot be measured from day to day with the same precision with which one could estimate the value of a blue chip stock at 4:05 p. m., nevertheless, I cannot assume in the absence of proof on this issue that it is impossible to give a reliable approximation of the value of such route. Newspaper routes are frequently bought and sold. Since plaintiffs have failed to establish the negative, i. e., the inability to prove losses in a definite liquidated amount, I cannot invoke a doctrine of judicial notice to cover plaintiffs' evidentiary gap.

In summary then, the failure of plaintiffs to prove irreparable harm combined with the novel and intricate legal questions upon which the law is not clear lead me to refrain from granting plaintiffs' motion for preliminary injunction.

Triangle's motion to dismiss will also be denied since the allegations of plaintiffs' complaint, especially those dealing with policing and vertical agreements, state a cause of action under the Beech-Nut and Dr. Miles cases, supra.

To the extent that what I have said constitutes Findings of Fact and Conclusions of Law, this Opinion shall be considered as containing them. In addition, I affirm, albeit in different form, plaintiffs' Request for Findings of Facts Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 15, 16, 17, 21, 22, 23, 24. No. 18 is affirmed except for the Davidson agreement. I also affirm defendant's Request for Findings of Facts Nos. 1, 2, 3, 4, 6, 8, 11, 13, 14, 15, 17, 18, 19, 20, 22, 23, 24, 25, 26 and 35. All other Requests for Findings of Fact and Conclusions of Law not in harmony with those stated in this Opinion are severally denied.

The accompanying Order also includes rulings on related discovery phases of this case which are pending.

### ORDER

And now, this 21st day of August, 1964, plaintiffs' motion for preliminary injunction is hereby denied and defendant's motion to dismiss is also denied.

On the discovery phases of this litigation, since defendant has priority in discovery it shall proceed within a reasonable time to complete its discovery. Upon completion of defendant's discovery, plaintiffs and counterdefendants may commence their discovery.

Defendant's general objection to plaintiffs' interrogatories on the ground of priority is sustained. Similarly, defendant's motion for a protective order as to plaintiffs' notice of deposition is granted until defendants complete their discovery, at which time plaintiffs may proceed with their discovery. Plaintiffs' request for admissions under F.R.Civ.P. 36 is granted and plaintiffs' motion for sanctions for refusal to make discovery under F.R.Civ.P. 37 is denied.