**INSTANT DELIVERY CORP.**

v.

**CITY STORES COMPANY (LIT BROTH-ERS DIVISION), Strawbridge & Cloth-ier, Gimbel Brothers, Inc., John Wana-maker Philadelphia, and Tose, Inc.**

Civ. A. No. 68–262.

United States District Court
E. D. Pennsylvania.

May 6, 1968.

Harold E. Kohn, Aaron M. Fine, Dolores Korman, David Pittinsky, Philadelphia, Pa., for plaintiff.

Theodore R. Mann, Philadelphia, Pa., for City Stores Co. and Strawbridge & Clothier.

Edward W. Mullinix, Kimber E. Vought, Philadelphia, Pa., for Gimbel Brothers, Inc.

Robert W. Sayre, Philadelphia, Pa., for John Wanamaker Philadelphia.

Edwin P. Rome, Philadelphia, Pa., Desmond J. McTight, Norristown, Pa., for Tose, Inc.

## SUR MOTION FOR PRELIMINARY INJUNCTION

LUONGO, District Judge.

For the past several months Instant Delivery Corp., plaintiff herein, has been performing a package delivery service for two of the four major local department stores. Recently the four stores decided to re-establish consolidated delivery. Instant and the carrier which served the other two stores competed with each other to be selected for the consolidated delivery. Instant lost out. It instituted this suit for damages against the four stores and the successful carrier, charging violations of the antitrust laws. The matter is before the Court on Instant's motion for preliminary injunction. Instant seeks to enjoin, preliminarily and until final hearing, the two stores it now serves from discontinuing the use of its services. In effect, Instant seeks an order requiring the two stores to continue to deal with it until the trial of the antitrust suit which, in the normal course of events, will not take place for several years.

Upon pleadings and proof, the Court makes the following

### FINDINGS OF FACT

1. Plaintiff is Instant Delivery Corp., a New Jersey corporation, which is a common carrier and is in the business of delivering packages for retail business establishments including department, clothing, and specialty stores, and mail order houses.

2. The store defendants are City Stores Company, Lit Brothers Division (Lits), Strawbridge & Clothier (S&C), Gimbel Brothers (Gimbels) and John Wanamaker Philadelphia (Wanamaker), which operate department stores in the Eastern District of Pennsylvania.

3. Defendant Tose, Inc. is a common carrier which performs, inter alia, the service of delivering packages for re-

tail business establishments including department, clothing and specialty stores. It transacts business within the Eastern District of Pennsylvania.

4. For approximately 30 years prior to April 1967, the four store defendants made use of a consolidated package delivery service furnished to them by United Parcel Service (UPS). The four store defendants had, over the years, found the consolidated delivery service to be the most efficient and economical method of package delivery because that arrangement made possible a greater concentration of deliveries to a given geographical area.

5. Under the consolidated delivery service, the one carrier, UPS picked up packages from each of the four stores (and other stores which made use of the service), transported them to a transfer point where the packages were sorted, re-routed, and put into smaller trucks for delivery to the purchasers of the commodities on the routes served by the smaller trucks.

6. In April 1967, there were labor difficulties between UPS and Local 107 of the Teamsters Union resulting in a cessation of package delivery and resulting ultimately, in July 1967, in UPS's terminating its operations in the Philadelphia area.

7. Following the strike in April 1967, UPS officials regularly visited each of the four stores and reported on the progress of negotiations. Thereafter, for convenience, joint meetings were held between officials of UPS and representatives of the four stores. During the early summer of 1967, a delivery committee, consisting of representatives of the four stores, was set up to discuss and deal with the delivery problem. These meetings were held periodically throughout the summer, fall and winter of 1967 on through January 1968.

8. At the time UPS left, there was no carrier in the Philadelphia area with the experience or the facilities to perform a consolidated delivery service for the four store defendants. To meet the emergency created by the departure of UPS the four store defendants temporarily abandoned consolidated delivery and sought alternative means for effecting delivery of packages to their customers.

9. In the period immediately following UPS' cessation of delivery service, three of the four store defendants used the United States Post Office for the delivery of packages within parcel post size limits and two common carriers, ABC and Shulman, for packages exceeding parcel post size. The fourth store, Wanamaker, purchased and leased delivery equipment and attempted to make deliveries, partially by its own personnel and partially by the use of common carriers to the extent that such carriers were available.

10. In about July 1967, S&C entered into an oral arrangement with Instant. At first the arrangement was for the delivery only of packages exceeding parcel post size, but later it was expanded to include parcel post size packages. On October 31, 1967 the oral arrangement was replaced by a written agreement, terminable by either party on 30 days' notice. To effectuate the arrangement between the parties, S&C purchased 25 trucks from UPS and leased them to Instant for the period that Instant was to perform delivery services for S&C. Instant understood that its services were being utilized as a temporary measure for the oncoming Christmas season, and that S&C intended to seek a more permanent solution to the delivery problem after the Christmas rush.

11. Three or four weeks later, in August 1967, Instant entered into an oral arrangement with Lits to deliver its packages. At first the arrangement covered non-mailable packages only, but it was later expanded to cover the delivery of the bulk of Lits' packages. Instant was aware when it accepted the business from Lits that it was a temporary measure for the oncoming Christmas season. To effectuate the arrangement between the parties, Lits acquired

25 trucks from UPS and leased them to Instant for the period of time that Instant was to perform delivery service for Lits.

12. From the time it entered the package delivery business in March 1966 until July 1967, Instant had performed a retail package delivery service for a relatively few mail order houses, specialty stores and other retail establishments.

13. After the acquisition of the S&C and Lits business, Instant hired some additional personnel and leased a terminal facility at Cherry Hill, New Jersey to supplement one it already had in Gloucester, New Jersey. It acquired more motor vehicles, some by purchase, but by far the greater number by short term lease from S&C and Lits. Plaintiff presented no evidence as to the terms and conditions of the lease of the Cherry Hill facility other than that it is for a term of five years. At the time of the hearing there was less than a year remaining on the lease of the Gloucester facility.

14. When Instant first proposed to perform delivery service for S&C, it proposed to do so without a union contract, intending to use an association of truck owner-operators. That proposal was rejected by S&C because it did not want a recurrence of the labor difficulties it had experienced with UPS. Instant thereupon entered into a contract with Local 676 of the Teamsters Union under which Instant was permitted to pay its drivers on a piece rate basis (incentive system) for the delivery of packages. This arrangement enabled Instant to operate the package delivery service at a relatively low per unit labor cost.

15. During the summer of 1967, Gimbels and Wanamaker offered their package delivery business to Instant which rejected the offer because it was unable to handle so great a volume.

16. In September 1967, Tose offered to perform package delivery service for Wanamaker and Gimbels. It filed applications with the Interstate Commerce Commission and with the Pennsylvania Public Utility Commission, seeking emergency rights to enable it to perform such service. Instant and, at Instant's behest, ABC protested the grant of ICC rights to Tose on the ground that the services were not needed. As part of its effort to block Tose's application for emergency rights, Instant sent letters to Gimbels and Wanamaker at the end of October 1967 advising each that it was ready, willing and able to perform package delivery service for it.

17. On or about October 2, 1967, Tose commenced delivering packages for Gimbels and Wanamaker. At about that time, Tose's president, Leonard Tose, consulted with national officers of the Teamsters Union seeking to obtain for his company a labor contract comparable to the one enjoyed by Instant. These efforts brought to the attention of Teamsters Union national officers the existence of Instant's favorable piece rate contract, which they promptly thereafter caused to be cancelled. The contract, which was not due to expire until December 4, 1969, was declared null and void by the national officers and was rescinded by telegram dated November 8, 1967 from the president of Teamsters Local 676 to Instant.

18. The termination of Instant's favorable contract resulted solely from Tose's attempt to obtain a similar contract and not from an attempt by Tose to cause the Teamsters Union to cancel Instant's contract.

19. The arrangement entered into by Gimbels and Wanamaker with Tose was intended as a temporary measure only, designed to take care of package delivery until after the 1967 Christmas season. Notwithstanding the temporary nature of the arrangement, Tose purchased from UPS 115 delivery vans and 8 larger trucks for line haul service.

20. On about December 1, 1967, the Teamsters Union placed picket lines around Instant's Cherry Hill and Gloucester facilities. The presence of the

picket lines presented a serious threat of interruption or cessation of delivery of S&C and Lits packages. Representatives of S&C advised Instant that S&C could not continue to use the delivery service of Instant unless the latter's labor situation was cleared up. Thereafter, on December 5, 1967, Instant entered into a supplementary labor agreement with Local 676 which substituted an hourly rate for Instant's drivers in place of the piece rate provided under the rescinded contract.

21. The hourly rate provided in the supplemental labor agreement caused Instant's per unit package delivery costs to rise.

22. In December 1967 and in January 1968, Leonard Tose informed Gimbels and Wanamaker that Tose would be unable to maintain efficient service at the existing rates with the anticipated drop in volume of deliveries after the Christmas season. He indicated that a daily volume of 8,000 to 12,000 packages was required to maintain the desired efficiency and rates, whereas the Gimbels-Wanamaker post-Christmas daily volume was expected to total not more than 4,000 to 5,000. Gimbels and Wanamaker became concerned that Tose would abandon the retail package delivery service unless consolidated delivery service (as had been provided by UPS), with the resultant volume and density of deliveries required for an efficient operation, was re-established.

23. Tose's package delivery operation for Gimbels and Wanamaker was not performed at a loss. Leonard Tose's statement that Tose operated at a loss reflected the charging off of certain unusual start up costs (including advertising, purchase and painting of vehicles) as expenses of operation over a short period of time, rather than a proper amortization of such costs over a more extended period of operation.

24. On December 8, 1967, when Tose and Instant were both aware that the four stores were contemplating re-establishment of the consolidated delivery

service, Harry Fox, president of Instant, sought out Leonard Tose and proposed that they eliminate the competition between them. He offered to sell his business to Tose or to buy Tose's package delivery business under an arrangement to be kept secret from the four store defendants. Mr. Tose rejected the proposals offered by Mr. Fox.

25. After the 1967 Christmas season, the four stores invited Tose and Instant to make presentations as to their capability to perform a consolidated delivery service. A meeting of representatives of the four stores was held for that purpose on January 25, 1968. During the course of Instant's presentation, the Gimbels representative offered to Mr. Fox a proposal for a clause to be included in any agreement which might be entered into between them. The clause sought to limit the grounds for seeking increase in rates. Mr. Fox responded that in his opinion a common carrier could not enter into such an agreement. There was no further discussion of the clause. The response by Mr. Fox to the proposal played no part in the ultimate selection of the carrier to perform the consolidated service.

26. After the presentations by Instant and Tose were heard, the meeting adjourned without discussion and without decision as to the choice of carrier to perform the consolidated service. Gimbels and Wanamaker were each of the view that Tose was the more financially stable and enjoyed better labor relations and was therefore the more desirable of the two carriers to perform the consolidated service. They undertook to persuade representatives of S&C and Lits of the wisdom of their choice.

27. Some time after the January 25, 1968 meeting, after further investigation, and after the airing of differences of opinion among various of the personnel of S&C, S&C independently arrived at the decision that Tose was the more capable of the two carriers to perform the consolidated service. S&C's choice was influenced, in part, by the arguments and persuasions of repre-

sentatives of Gimbels and Wanamaker favoring the choice of Tose.

28. At a meeting of representatives of the four stores held on January 31, 1968, the S&C representatives announced to the others the decision earlier arrived at by S&C to select Tose. Thereafter, the Lits representative informed the group that Lits also favored the choice of Tose.

29. Lits' choice of Tose was influenced, in part, by the arguments and persuasions of representatives of Gimbels· and Wanamaker and by the announcement of S&C's decision to select Tose. Lits did not want to be left out of the consolidated delivery service arrangement.

30. Tose was not a party to, and did not participate in, the decision making process by which the four store defendants determined to re-establish the consolidated delivery service.

31. Tose and Instant were competitors seeking to be selected as the carrier to perform the consolidated delivery service which the four store defendants had determined to re-establish. Apart from making presentations to the four store defendants as to their respective capability to perform such service for them, neither Tose nor Instant had anything to do with the making of the decision by which Tose was selected as the carrier to perform the service.

32. The four store defendants did not enter into an agreement to refuse to deal with Instant. Their agreement was limited to the re-establishment of a consolidated delivery service, with which they had earlier enjoyed a long and satisfactory experience, and to the selection of one of two competing carriers to perform that service.

33. Tose and Instant are common carriers operating under published tariffs and with specified rights. Neither possesses rights sufficient to enable it, without the use of other carriers, to fulfill all of the delivery needs of the four stores. Tose is able to pick up packages from the four stores in Philadelphia, which gives it an advantage over In-

stant, but its delivery area, on the other hand, is more limited than Instant's. Considering the differences in the services provided, the rates charged by Tose and Instant to the four stores are roughly equivalent.

34. About 70% to 75% of Instant's present volume of business is made up of packages delivered for S&C and Lits. Instant was aware when it undertook to deliver for S&C and Lits that the arrangements were temporary and that its services were terminable on relatively short notice. Instant operated on a small scale before it began to serve S&C and Lits. If it loses that business, it will be able to resume operations on a smaller scale and remain in business.

35. Instant will not suffer irreparable harm by the refusal of a preliminary injunction. If it should ultimately prevail in its suit, the harm to it is definitely ascertainable and fully compensable by a money award. The number of packages delivered for each of the four stores will be a matter of record. The loss of profits from the loss of such business is subject to relatively easy computation. The loss, if any, for the remaining term of the lease of the Cherry Hill facility, as well as any loss sustained by the sale of any vehicles is likewise ascertainable and compensable.

## DISCUSSION

██ A preliminary injunction may issue (15 U.S.C. § 26) to prevent violations of the antitrust laws, but to be entitled to such relief plaintiff must satisfy the Court that the conduct sought to be enjoined violates the antitrust laws, that there is a substantial likelihood that plaintiff will prevail at the ultimate trial on the charges of antitrust violations, and that it will suffer irreparable harm if the injunction pendente lite is denied. Kontes Glass Co. v. Lab Glass, Inc., 373 F.2d 319 (3d Cir. 1967); McKesson and Robbins, Inc. v. Charles Pfizer & Co., Inc., 235 F.Supp. 743 (E.D. Pa.1964). If there are complex issues of law and fact, resolution of which is not free from doubt, a preliminary in-

junction should not issue, for "to doubt is to deny." Graham v. Triangle Publications, Inc., 233 F.Supp. 825 (E.D.Pa. 1964); Madison Square Garden Corp. v. Braddock, 90 F.2d 924, 927 (3d Cir. 1937).

■ Failure of plaintiff to demonstrate either (I) a substantial likelihood that it will ultimately prevail on the antitrust charges, or (II) that its remedy at law is inadequate precludes issuance of a preliminary injunction. Plaintiff has failed to carry its burden on both counts.

I. *Antitrust Violations.*

There is considerable doubt that plaintiff will be able to establish that the conduct of the four department stores in setting up the consolidated delivery service violates the antitrust laws.

(a) *Per se violation.*

■ Plaintiff contends that the agreement to select the carrier to perform that service is a *per se* violation in that it constitutes a concerted refusal to deal with plaintiff. It cites and relies on Klor's, Inc. v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) and a number of other cases [1] holding that group boycotts or concerted refusals to deal are in the forbidden (*per se*) category of combinations. In each of those cases the aim and purpose of the group boycott or refusal to deal was either to compel the object of the boycott to adopt a certain standard of trade practice, or to exclude him from competition.

In the case at bar, the only "refusal to deal" with Instant was that inherent in the selection of some other carrier to perform the consolidated delivery service. The "exclusion" was a by-product of the decision to reinstitute consolidated delivery which necessarily involves the use of one carrier. To enhance the "refusal to deal" contention, Instant argues that Tose induced and persuaded the four stores to refuse to deal with Instant by threatening to stop serving Gimbels and Wanamaker. What plaintiff characterizes as a "threat" was a simple statement of a fact already known to Gimbels and Wanamaker, i. e. that efficient service at the rates Tose was then charging (which were the rates formerly charged by UPS) required the combined volume of deliveries of the four major department stores. The decision to return to consolidated delivery was a reflection of the long and satisfactory experience the four stores had had with that system. I find nothing in this record to evidence an intent to discriminate against or to exclude Instant. Quite to the contrary, Instant was invited to compete, and did so vigorously, for selection as the carrier to perform the consolidated delivery. Its presentation was considered along with that of Tose and the selection remained in doubt until the very end. The decision that each of the stores made was to select Tose, not to exclude Instant. Instant is a disappointed competitor, not the object of an illegal boycott. See Interborough News Co. v. Curtis Publishing Co., 225 F.2d 289 (2d Cir. 1955). Cf. Parmelee Transportation Co. v. Keeshin, 186 F.Supp. 533 (N.D.Ill.1960) aff'd 292 F.2d 794 (7th Cir. 1961), cert. denied 368 U.S. 944, 82 S.Ct. 437, 7 L.Ed.2d 401 (1961), see generally, Barber, Refusals to Deal Under Federal Antitrust Laws, 103 U. of Pa. L. Rev. 847 (1955). In my view, the conduct of the defendants in re-establishing consolidated delivery and selecting Tose as the carrier to perform it is not a *per se* violation of the antitrust laws.

[1]. United States v. General Motors Corp., 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed. 2d 415 (1966); Eastern States Retail Lumber Dealers' Ass'n v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); Fashion Originators Guild of America, Inc. v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941); Paramount Pictures, Inc. v. United Motion Picture Theatre Owners, 93 F.2d 714 (3d Cir. 1937); Evening News Publishing Co. v. Allied Newspaper Carriers of New Jersey, 263 F.2d 715 (3d Cir. 1959); Jerrold Electronics Corp. v. Wescoast Broadcasting Co., Inc., 341 F.2d 653 (9th Cir. 1965).

(b) *Unreasonable Restraint of Trade.*

■ Whether consolidated delivery constitutes an unreasonable restraint of trade can only be resolved at the trial on the merits of the antitrust charges, after the parties have had an opportunity to develop fully the factual setting out of which consolidated delivery emerged. For a discussion of factors to be considered in determining whether restraint of trade is unreasonable, see Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1917). On the evidence presented at this preliminary hearing I cannot say that it is an unreasonable restraint of trade, or that plaintiff has demonstrated a substantial probability that it will prevail ultimately on that issue. The four department stores had used UPS to deliver their packages for thirty years. Many other retail business establishments also used it. The volume thus generated made possible greater efficiency and economy in sorting, routing and handling packages, provided a greater concentration of deliveries into a given area, and generally resulted in more efficient service at lower cost. Nevertheless, notwithstanding these advantages to the users of the service, plaintiff may be able to show that the arrangement unreasonably restrains trade. If plaintiff does ultimately show unreasonable restraint of trade, it has an adequate remedy at law for the harm caused thereby.

II. *Adequacy of Remedy at Law.*

(a) *Irreparable Harm.*

Plaintiff has not persuaded me that its remedy at law is inadequate. It contends that it will be put out of business if it loses the S&C and Lits volume. I do not accept that. Instant knew when it was engaged by those stores that the arrangements were temporary and that both would seek a more permanent solution to their delivery problems as soon as the press of the 1967 Christmas season was over. Instant made its plans to handle the increased volume with the full realization that it might have to return to the smaller scale operation on short notice. Thus, it made no extensive investment in delivery equipment to handle the S&C and Lits business. It obtained vehicles from S&C and Lits (purchased by them from UPS) on short term lease, effective only for as long as Instant was delivering for them. While it increased the number of its employees, there is nothing to indicate that it will be unable to reduce the number. There was testimony that Instant entered into a lease for a facility at Cherry Hill, New Jersey, in addition to one it had at Gloucester, New Jersey, but beyond the fact that it was for a five year term, plaintiff offered no evidence as to the terms or conditions of the lease, or as to the size of the facility, or the future plans for it. The omission may be significant in light of the fact that the lease for the Gloucester facility had less than a year remaining as of the time of the preliminary hearing. In any event there is no evidence that Instant will be overburdened by the lease.

Just as it suffered growing pains when it expanded its operation, Instant will undoubtedly suffer some inconvenience and may sustain some losses in the contraction of its operations to pre-S&C-Lits proportions, but it will survive and will continue to do business. If it be ultimately determined that defendants' conduct was unlawful and that plaintiff was harmed thereby, its loss can easily be measured and compensated by an award of damages. The number of packages delivered for each of the stores will be a matter of record. The amount of profit is capable of computation. If Instant suffers a loss with respect to delivery equipment, or with respect to the lease of the Cherry Hill facility, such loss is capable of proof and is clearly compensable by an award of money damages. Graham Triangle Publications, Inc., 344 F.2d 775 (3d Cir. 1965), affirming 233 F.Supp. 825 (E.D.Pa.1964).

Cases cited by plaintiff on irreparable harm (e. g. Bergen Drug Co., Inc. v. Parke, Davis & Co., 307 F.2d 725 (3d Cir. 1962); McKesson and Robbins, Inc. v.

Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964); Airfix Corp. of America v. Aurora Plastics Corp., 222 F.Supp. 703 (E.D.Pa.1963)) are distinguishable. Each involves the wrongful withholding of a product line for re-sale by wholesalers with consequent hard to establish loss of trade and goodwill. The *Bergen* and *McKesson* cases deal with refusals by drug manufacturers to supply important drug products to a full line, full service wholesaler. It was emphasized that pharmacies prefer to deal with full line, full service wholesalers, and if a particular wholesaler is unable to fulfill all their requirements, they are apt to take their business, permanently, to a wholesaler who can. As stated by the Court of Appeals in *Bergen,* 307 F.2d at 728:

> "It would be impossible to estimate or compute plaintiff's damages for the loss of goodwill which it will suffer as a result of being unable to provide its retail customers with service at least equally as good as that furnished by other wholesalers who have a continuing access to defendant's products."

In the case at bar there is no question of loss of "customers" other than S&C and Lits and, as pointed out above, the damages, if any, from that loss are ascertainable and compensable.

(b) *Propriety of the Injunctive Relief Requested.*

Even if a plaintiff is able to show irreparable harm, grant of preliminary injunctive relief is not inevitable. The grant of such relief lies in the discretion of the Court after a balancing of the interests of the parties and the possible harm to them. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); Rice & Adams Corp. v. Lathrop, 278 U.S. 509, 49 S.Ct. 10, 73 L.Ed. 520 (1929); Zeaner v. Highway Truck Drivers and Helpers, Local 107, 234 F.Supp. 901 (E.D.Pa.1964).

Arguing that it has shown irreparable harm, plaintiff has asked for a preliminary injunction "to preserve the status quo." The form of order it seeks would require S&C and Lits to continue to use Instant for deliveries until the trial on the antitrust charges. In the normal course of events in this district that trial will not take place for several years. That form of order would give to plaintiff more than the injunctive relief to which it would be entitled if it were to prevail at the trial on the merits of the antitrust charges. After trial, it is highly unlikely that the Court would do more than enjoin the defendants from acting in concert to accomplish consolidated delivery. Certainly it would not issue an injunction which would, in effect, award a franchise to a carrier to deliver for one or more of the stores.

Be that as it may, as I view the status quo, it is the absence of consolidated delivery. If plaintiff had satisfied me that its remedy at law is inadequate and that a preliminary injunction should issue, I would not have been disposed to do more than to prohibit the defendants from acting in concert to effect consolidated delivery.

The motion for preliminary injunction will be denied.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter.

2. The actions of the four department store defendants seeking to re-establish a consolidated delivery service and selecting Tose, Inc. as the carrier to perform that service did not constitute a *per se* violation of the antitrust laws.

3. Plaintiff has failed to show a substantial probability that it will prevail at the trial on the merits on its charges that the actions of the defendants in re-establishing a consolidated delivery service and selecting a carrier to perform it constitute violations of the antitrust laws.

4. In the event that plaintiff does prevail at the trial on the merits, its loss may be adequately compensated at law by an award of damages.

5. Plaintiff has failed to establish that it will be irreparably harmed if the

requested preliminary injunction does not issue.

6. Greater harm would be caused to the defendants by the issuance of the requested preliminary injunction than will be caused to plaintiff by the denial thereof.

7. Plaintiff is not entitled to the issuance of a preliminary injunction.