**Herbert ADELMAN**

v.

**CGS SCIENTIFIC CORPORATION et al.**

**Civ. A. No. 71–1658.**

United States District Court,
E. D. Pennsylvania.

Aug. 26, 1971.

Memorandum and Order Sept. 14, 1971.

Stuart Savett, Harold E. Kohn, P. A., Philadelphia, Pa., for plaintiff.

David P. Bruton, Philadelphia, Pa., for J. H. Clark.

Donald A. Scott, Philadelphia, Pa., for Arthur Andersen & Co.

Robert Lewis Seigle, Philadelphia, Pa., for Raymond F. McHugh, Jr.

Arthur E. Newbold, IV, Philadelphia, Pa., for Elliott L. Goldman.

Franklin Poul, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for CGS Scientific Corp., and Albert J. Feldman, Curtis J. Yamas, Gerald J. Wood, Reuben Wasserman and John W. Hurley.

### FINDINGS OF FACT
### CONCLUSIONS OF LAW
### AND ORDER

BRODERICK, District Judge.

This matter is before the Court to determine whether preliminary relief should issue pending a final determination of this case on the merits in connection with a civil action brought by

plaintiff Herbert B. Adelman, who seeks rescission of an allegedly fraudulent contract of sale whereby the Crowell Corporation, of which he was a 20% owner, was sold to the Defendant CGS Scientific Corporation.

After hearings on July 9, 19 and 20, 1971, on plaintiff's motion for a preliminary injunction and appointment of a receiver or custodian of the Crowell Division of CGS Scientific Corporation, the Court makes the following:

## FINDINGS OF FACT

1. Plaintiff, Herbert B. Adelman (Adelman), is a citizen of and resides in the state of Delaware.

2. The individual defendants Albert J. Feldman (Feldman), John H. Clarke (Clarke), Elliott L. Goldman (Goldman), Curtis J. Yamas (Yamas), Gerald J. Wood (Wood), and Raymond F. McHugh, Jr. (McHugh) are individuals residing in Pennsylvania. The defendant Reuben Wasserman (Wasserman), is an individual residing in Massachusetts. The defendant John W. Hurley (Hurley) is an individual residing in New York. The partnership defendant Arthur Andersen & Co. is a firm of certified public accountants with a place of business in Pennsylvania. The defendant CGS Scientific Corporation (CGS) is a Pennsylvania corporation with its principal place of business in Pennsylvania.

3. Adelman, prior to September 10, 1969, was the owner of twenty percent of the stock of the Crowell Corporation (Crowell). He was also the President of Crowell at an annual salary of $26,000.

4. The Crowell Corporation, now the Crowell Division of CGS Scientific Corporation, manufactured and continues to manufacture gummed tapes.

5. In an arbitration proceeding on September 10, 1969, between Adelman and the owners of the eighty percent interest of Crowell, it was stipulated that the value of Crowell was $1,600,000. Adelman was given the right to purchase or to cause to be purchased the other eighty percent interest in Crowell for $1,280,000 within thirty days. If this right was not exercised within thirty days, Adelman's twenty percent stock interest in Crowell could be purchased within the following thirty-day period for $320,000 by either the holders of the eighty percent stock interest, the Crowell Corporation, or a third party.

6. On October 8, 1969, Clarke was the President and Goldman was the Treasurer of CGS.

7. During the preliminary discussions between CGS and Adelman for the sale of Crowell to CGS, which took place prior to October 8, 1969, it is highly probable that: (a) Adelman received through the mail from Clarke, as President of CGS, an unpublished internal interim financial report of CGS consisting of the balance sheet and income statement for the three-quarter period of 1969; (b) Adelman, his attorney and Goodman were shown the Annual Report of CGS for the fiscal year ending August 31, 1969; (c) these unpublished figures of the Annual Report then appeared as the year-end figures in the 1969 Statement of CGS audited by Arthur Andersen & Co.

8. It is highly probable that plaintiff relied on representations as to the financial strength of CGS, its prospects for the future and the ability of CGS to raise the necessary cash to consummate the deal and that plaintiff at that time was also considering offers from other possible buyers of Crowell.

9. On October 8, 1969, Adelman negotiated the sale of Crowell to CGS:

(a) Pursuant to an agreement signed on October 8, 1969, between Adelman, and other stockholders of Crowell and CGS, CGS paid $1,280,000 in cash to the owners of the eighty percent stock interest of Crowell.

(b) In a separate agreement of the same date, October 8, 1969, CGS purchased Adelman's twenty percent stock interest in Crowell for $100,000 cash, plus twenty-five thousand shares of CGS common stock with a par value of $0.20 per share, plus additional shares of CGS

common stock to be issued in each year from 1970 through 1974 computed from a formula set forth in the agreement, which formula was based on the net earnings of Crowell, the fiscal year base income and the average price of CGS common stock. Also, Adelman was to be given additional shares of CGS common stock, not to exceed 4,000 shares, which would be necessary to make so many of the 25,000 shares issued at closing as were held on November 30, 1970, equal to the value such shares which were then held would have if the price of CGS common on November 30, 1970 were twenty dollars per share.

10. At closing of the agreement mentioned in 9(b) above, Adelman, the President of Crowell, Goodman, the General Manager, and Donald Blevins (Blevins), the Production Foreman, executed employment agreements with CGS.

11. No warranties were made in the agreement, signed October 8, 1969, by CGS to Adelman with respect to the financial statements or financial condition of CGS. Adelman, however, made numerous warranties and the agreement provides that " * * * there are no representations, warranties, understandings or agreements with respect to such transactions other than those expressly set forth herein * * *."

12. The unpublished figures of the CGS annual report referred to in (7) above appeared as the year-end figures in the published 1969 Annual Report of CGS.

(a) The financial statements contained in the 1969 Annual Report for the fiscal periods ending August 31, 1969 and August 31, 1968 (restated) were prepared by Arthur Andersen & Co.

(b) Arthur Andersen & Co.'s report was dated October 3, 1969.

(c) The financial statement of CGS for the year ending August 31, 1969, showed:

|  | 1969 | 1968 (Restated) |
| --- | --- | --- |
| Net Income | $366,679.00 | $161,558.00 |
| Earnings Per Common Share | 0.53 | 0.30 |

13. From October 8, 1969 to June 1970, Crowell Corporation was operated as an autonomous subsidiary of CGS with Adelman as the President. In June 1970, Crowell Corporation was liquidated and its assets distributed to CGS. Adelman agreed to this liquidation in writing. Crowell is now operated as a division of CGS with Adelman as its Chief Executive Officer.

14. From the time of acquisition of Crowell, Adelman attended the meetings of the CGS Board of Directors by invitation. In September 1970 Adelman was elected a member of the CGS Board of Directors and remained in this capacity until March 1971. Adelman solicited proxies for the management slate headed by Curtis J. Yamas (Yamas) for President of CGS in March 1971.

15. Yamas was President and majority shareholder of United Scale Models until July 2, 1969, when this company was acquired by CGS.

16. In August 1970, Yamas, other Directors of CGS and Adelman learned of an unreported loss for 1969 by the Environmental Division of CGS, other indications of errors in the financial statements of CGS and evidence of financial manipulations in CGS.

17. On the basis of the information learned in (16) above, a special meeting of the Board of Directors of CGS was held on September 10, 1970. This meeting was attended by the entire Board, consisting of Clarke, Feldman, Goldman, Hurley, McHugh, Taylor, Wasserman, Wood and Yamas. Also present by invitation were representatives from Arthur Andersen & Co., Adelman, and Joseph M. Manko, Assistant Secretary and of counsel. Following a report on the preliminary findings by Arthur Andersen & Co. of financial misstatements, Clarke resigned and Yamas was elected as the new President of CGS.

18. Goldman resigned as Secretary and Treasurer of CGS on September 11, 1970.

19. A press release was issued on September 16, 1970 by CGS which stated

that the interim results for the six-month period, ending February 28, 1970, and the nine-month period, ending May 30, 1970, as previously reported were overstated; the press release also said that the previously reported 1969 results might have been affected by the overstatement, and that for the fiscal year ending August 31, 1970 a substantial loss by CGS would be reported. These overstatements were attributed in the press release to " * * * a number of actions recently discovered by the Board, including improper record keeping, misallocation of expenses, and overestimates of the extent of completion on contracts in process in the company's Environmental Division."

20. At the Board of Directors' Meeting of CGS on September 23, 1970, Mr. Goldman resigned as a Director of CGS and Adelman was elected. Adelman was also elected a Vice-President of CGS at this time. The sale of one or more divisions of CGS, including Crowell, was discussed at this meeting. Also, Feldman, a director and corporate counsel of CGS, cautioned all present at the meeting against making any unauthorized disclosure to any private persons or against the transfer of any of the Company's securities owned by them until a public release had been made of the Company's financial statements for the preceding fiscal year.

21. On September 25, 1970, in conformity with similar actions of other directors of CGS, Adelman signed an agreement authorizing the transfer agents for CGS to block the transfer of all securities listed in his name until approximately thirty days after the release of the company's annual report.

22. At a regular meeting of the Board of Directors of CGS on October 29, 1970, after a representative from Arthur Anderson & Co. discussed with the Board the tentative figures for the company's fiscal year ended August 31, 1970, the Board was advised by Yamas that these figures could not be divulged to anyone until they were made final and released to the public.

23. A press release issued by CGS on November 13, 1970, advised that for the fiscal year ended on August 31, 1970, the net loss for CGS would be $1,179,000 ($1.37 per share), $123,000 of which the auditors were uncertain whether to charge to operations for the preceding fiscal year. The 1969 results, it was further announced, would be restated to reduce the net income to $337,000 ($0.41 per share) from the previously reported net income of $406,000 ($0.49 per share).

24. The published annual report of CGS for 1970, which became available to the public probably in December 1970, contained Arthur Andersen & Co.'s report dated November 11, 1970.

(a) The financial statement of CGS for the year ending August 31, 1970 showed the following:

|  | 1970 | 1969 (Restated) |
|---|---|---|
| Net Loss | $1,178,699. | Net income $337,157. |
| Net Income Per Common Share | 1.37 | 0.44 |

(b) Note (1) of this report states in pertinent part:

"The Company has recently discovered alterations and errors in the accounting records at its Environmental Division, affecting the records for both 1970 and 1969, as follows:

(a) a misallocation of labor and overhead costs through alteration of time cards, resulting in an overstatement of the percentage of completion of certain contracts in progress and a failure to record costs and expenses attributable to other contracts considered completed;

(b) withholding of vendors' invoices resulting in the failure to record costs and expenses in the proper period;

(c) overpricing of stock inventory;

(d) improper recording of a sale prior to shipment; and

(e) other errors of less significant amount.

Based on the foregoing, the accompanying consolidated balance sheet as

of August 31, 1969 and the consolidated statements of income and retained earnings for the year then ended have been retroactively restated to reflect the corrections believed to be appropriate, including a reduction of $69,088 ($.09 per share) in the amount of net income previously reported for fiscal 1969.

In addition, the accompanying consolidated statement of loss for the year ended August 29, 1970 reflects reductions of approximately $272,000 (before income tax effect) in the profits of certain long-term contracts from the amounts estimated as of August 31, 1969. Because of the conditions discussed above, the Company is unable to determine if any of such reductions could have been anticipated and the extent, if any, to which such reductions should be applied retroactively to the preceding year. If fully applied retroactively to the preceding year, the effect would be to reduce restated 1969 net income after provision for income taxes by approximately $123,000."

25. It is highly probable that CGS is experiencing financial difficulties and that its net worth is less than $1,600,000. The 1970 Annual Report for CGS showed as "Other Assets" that "Goodwill, not being amortized" was valued at $1,100,004. The Crowell Division is carried on the books of CGS at approximately $2,100,000.

26. On December 11, 1970 Adelman told Yamas that he was considering an action to rescind the Crowell transaction. His intention to file a complaint rescinding the original sale of the stock of Crowell to CGS was confirmed by letter dated 15 December 1970, from Adelman to Yamas. Yamas acknowledged the receipt of this letter by a letter dated 17 December 1970, to Adelman in which Yamas indicated that he and Feldman would "be willing to meet with you (Adelman) and your counsel at some mutually agreeable time."

27. It is highly probable that in December of 1970 Adelman had received commitments totaling $600,000 toward a tender to CGS of $1,380,000 of cash less whatever sums Crowell had sent to CGS during the time CGS owned Crowell.

28. For the first quarter of fiscal 1971, ending November 28, 1970:

(a) The published but unaudited figures of CGS show that the net loss was $19,400 and the loss per share was $0.02.

(b) After payment of a 2% fee to CGS, Crowell made a profit of $38,000.

29. For the second quarter of fiscal 1971, ending February 28, 1971, Crowell lost $9,000 after payment of a 2% corporate fee.

30. For the third quarter of fiscal 1971, ending May 31, 1971, Crowell lost $15,000 after payment of a 2% corporate fee.

31. For the eight-month period of fiscal 1971, ending April 24, 1971, the unpublished figures for CGS show a net loss of $510,700.

32. CGS has financial obligations of approximately $700,000 per year.

(a) This obligation is budgeted at $60,000 per month, with Crowell budgeted to pay $28,000 per month toward said amount.

(b) Crowell has paid over to CGS an average of $20,000 per month, but Crowell has not paid over to CGS any amount since the institution of this suit.

33. The net payover from Crowell to CGS from October 8, 1969 to June 15, 1971 was $380,000.

34. On March 17, 1971, Adelman requested that Yamas take action to resubsidiarize Crowell "due to credit purposes, legal claim purposes and from an operational standpoint."

35. It is highly probable that in May and June of 1971 Adelman again made oral demand for rescission.

(a) In Court on July 9, 1971, counsel for Adelman made an offer to give CGS $1,000,000 plus the return of all the stock of CGS which Adelman has received.

(b) It is highly probable that as of May 1971 Adelman had unconditional

commitments from third parties to supply all of the money needed to support his offer of rescission.

36. It is highly probable that subsequent to the press release by CGS of September 16, 1970, which gave public notice of the financial troubles of CGS, Crowell has experienced problems concerning the obtaining of credit necessary for its operations.

(a) Crowell had paid on discount or within terms for many years.

(b) It is highly probable that Goodman, the General Manager of Crowell, notified Yamas, the President of CGS, of these credit difficulties in the early part of 1971 and that Goodman worked out these problems by giving the suppliers of Crowell his personal guarantee that they would be notified if any change in the status of Crowell occurred.

(c) It is highly probable that Crowell was and is experiencing difficulty in convincing its major suppliers of Crowell's ability to pay its bills.

(d) It is highly probable that on the basis of the personal reputations of Adelman and Goodman in this business, on the fact that Crowell always paid its bills promptly, and on condition that the suppliers be notified immediately of any change in the management of Crowell, the major suppliers have continued shipments of goods to the Crowell Division of CGS.

(e) It is highly probable that the credit problems with suppliers to Crowell continue to date and Crowell must now conduct some of its transactions on a cash basis.

(f) It is highly probable that if Adelman, Goodman and Blevins leave the employ of Crowell some suppliers would discontinue supplying Crowell except on a cash basis.

37. It is highly probable that Crowell may be forced to seek money from CGS to continue operations.

38. On June 17, 1971, the Board of Directors authorized Yamas to advise Adelman that his employment contract would terminate on October 8, 1971. The letter from Yamas to Adelman, dated 6 July 1971, stated that: "Notice is hereby given in accordance with paragraph 2 of your Employment Agreement with this Company dated October 8, 1969 that your employment under the agreement will terminate on the anniversary date of this agreement, October 8, 1971."

(a) On June 17 or 18, 1971, Yamas as President of CGS authorized the same notice as contained above to be sent to Blevins and Goodman. These letters were sent to Blevins and Goodman and were dated 6 July 1971.

(b) On July 1, 1971, Blevins and Goodman sent to Yamas as President of CGS individual letters in which each stated in pertinent part that:

"In view of the above I do not wish to continue employment under the said contract, but would continue my employment without benefit of a contract."

39. On May 20, 1971, CGS renegotiated an unsecured demand note from Industrial Valley Bank (Philadelphia) State Street Bank and Trust Co. (Boston) and Wilmington Trust Co. (Wilmington). In this agreement:

(a) CGS pledged all of its assets as security for a loan of $2,765,000.

(b) CGS must maintain its consolidated net worth at not less than $850,-000.

(c) The value assigned to Crowell is $1,800,000. CGS may not sell Crowell for less than this assigned value without the consent of the banks.

(d) The aforesaid agreements with the banks provide:

"7. *Events of Default.*

7.1 This company shall be in default with respect to the Loan on the happening of any of the following events:

\*    \*    \*    \*    \*    \*

(f) Filing by this company or any subsidiary of a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization, arrangement, readjustment of *its debts*

or for any other relief under the Bankruptcy Act, as amended, or under any other insolvency act or law, state or federal, now or hereafter existing, or any action by this company or any subsidiary indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by this company or any subsidiary for or the appointment by consent or acquiescence of a receiver or trustee of this company or any subsidiary or for all or a substantial part of their property; the making by this company or any subsidiary of an assignment for the benefit of creditors; the inability of this company or any subsidiary or the admission by this company or any subsidiary in writing of its inability, to pay its debts as they mature.

(g) Filing of an involuntary petition against this company or any subsidiary in bankruptcy or seeking reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Act, as amended, or any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a receiver or trustee of this company or any subsidiary or for all or a substantial part of their property; or the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of this company or any subsidiary; and the continuance of any of such events for thirty (30) days undismissed, unbonded or undischarged."

## DISCUSSION

The Complaint in this action seeks relief under five counts, to wit:

(1) Count I is an action under the Securities Act of 1933, 15 U.S.C. § 77*l* and 15 U.S.C. § 77q, the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 CFR § 240.10b–5, adopted by the Securities and Exchange Commission pursuant to the Securities and Exchange Act of 1934, 15 U.S.C. § 78w.

The individual defendants, at all relevant times officers or directors of the defendant CGS, are alleged to be controlling persons under the Securities Exchange Act of 1934 (as amended), 15 U.S.C. § 78t. They are sued individually and as co-conspirators. The corporate defendant, CGS, is alleged to be liable because it engaged in all or part of the unlawful actions charged. The partnership defendant, Arthur Andersen & Co., is joined because of its alleged failure to follow proper accounting practices, thereby aiding and abetting the other defendants in the acts charged. The plaintiff, Adelman, has alleged fraud, deceit, and misrepresentation through the use of interstate commerce by the agents of the corporate defendant to induce him to sell his company to CGS. Stating that he has no adequate remedy at law, plaintiff has alleged that defendants have recklessly, negligently and wantonly mismanaged the affairs of CGS and asks that they be enjoined from dissipating the assets of Crowell and a receiver or custodian be appointed for Crowell so that the good name, assets and financial position of Crowell will not be jeopardized until it can be determined after a hearing on the merits that plaintiff has a right to rescission of the contract of sale by which Crowell was sold to CGS. Jurisdiction in this count is based on the Securities Act of 1933, 15 U.S.C. § 77v, the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1332, 1337.

(2) Count II alleges fraud and deceit and requests damages.

(3) Count III alleges that the fraud, deceit and misrepresentations practiced upon the plaintiff are such as to render the agreements whereby CGS acquired Crowell null and void *ab initio*. Plaintiff alleges tender and demand for rescission and requests that the same relief as is sought in Count I, namely rescission and restitution with an injunction to preserve the assets of Crowell prior to that time.

(4) Count IV alleges that rescission of the sale will not be feasible, unless equi-

table relief is granted pending the determination of this litigation and seeks the appointment of plaintiff as receiver for the assets of Crowell.

(5) Count V alleges that the acts, devices, schemes and misrepresentations of defendants constitute a fraud on plaintiff and requests that the assets of Crowell now held by any defendant or defendants be held in constructive trust for the plaintiff. Plaintiff further requests damages for waste and other conduct detrimental to Crowell and requests an injunction restraining such conduct and that a receiver be appointed to administer such constructive trust until a final decree is issued.

■ It is clear that this Court has jurisdiction to grant equitable relief under Count I of the complaint based upon the inherent equitable power of this Court to fashion effective and appropriate remedies for violations of the Securities and Exchange Act of 1934 (1934 Act) as enunciated in Mills v. Electric Auto-Lite Co., 396 U.S. 375 at 386, 90 S.Ct. 616, 24 L.Ed.2d 593, and for violations of the Securities Act of 1933 (1933 Act) as enunciated in Deckert v. Independence Shares Corp., 311 U.S. 282 at 288–290, 61 S.Ct. 229, 85 L.Ed. 189; and under Counts II through V upon diversity of citizenship between the parties since the amount in controversy is clearly in excess of $10,-000 exclusive of costs or interest.

■ The granting of preliminary relief rests upon plaintiff's ultimate right to rescission in this action. Indeed, the preliminary relief which plaintiff requests may be granted only on a showing of immediate and irreparable harm for which there cannot be adequate compensation in damages, accompanied by a clear probability of success on the merits. Industrial Electronics Corp. v. Cline, 330 F.2d 480 (3d Cir. 1964); John J. & Warren H. Graham v. Triangle Publications, Inc., 233 F.Supp. 825 (E.D.Pa. 1964), aff'd 344 F.2d 775 (3d Cir. 1965); Meiselman v. Paramount Film Distributing Corp., 180 F.2d 94 (4th Cir. 1950).

■■ Plaintiff's request for rescission alleges fraud, deceit and misrepresentations such as to render the contracts of sale of Crowell to CGS void from their inception. The traditional elements of common law fraud necessary to support such a claim are the false representation of a material fact, knowledge of its falsity by the person making it, ignorance of its falsity by the person to whom the representation is made, the intent that this representation should be acted upon, and that plaintiff did so act upon the representation to his damage. *E.g.,* United Insurance Co. of America v. B. W. Rudy, Inc., 42 F.R.D. 398 (E.D.Pa.1969). The plaintiff has, for the purposes of this preliminary relief, shown that he has a clear probability of success in the establishment of all of the aforesaid elements of fraud in a trial on the merits of this case. Adelman testified that Clarke, in his capacity as President of CGS, made representations to him as to the financial condition of CGS. Adelman also testified that he was shown literature on the financial condition of CGS which contained false information. It is highly probable that Clarke knew or should have known of the falsity of these financial statements, that these statements were shown to plaintiff to induce him to act, that plaintiff did act in reliance on these representations, and that plaintiff has suffered injury as a result of his sale of Crowell to CGS, since the value of stock he received as part of the consideration for the transaction was grossly overstated. Furthermore, since it is highly probable that plaintiff can establish the use of interstate commerce in connection with this securities transaction, it would follow that the plaintiff has also made out a case for preliminary relief under the Securities Exchange Act in view of the decisions which hold that the elements needed to prove fraud under federal securities laws are less stringent than at common law. Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963);

Lerman v. Tenney, 295 F.Supp. 780 (S.D. N.Y.1969).

■ One remedy available to the injured party who has established fraud is rescission of the contract which was fraudulently induced. As was stated in General Finance Corp. v. Keystone Credit Corp., 50 F.2d 872, 878 (4th Cir. 1931):

> "Furthermore, it is well settled that a false representation of a material fact constituting an inducement to a contract, on which the opposite party has a right to rely, is ground for rescission in equity, though the party making the representation may have been ignorant as to whether it was true or false; the real inquiry being, not whether the party making the representation knew it to be false, but whether the opposite party believed it to be true, and was misled by it in entering into the contract."

On the basis of the record as it now stands in this case, it is highly probable that plaintiff can make out a case for rescission under the doctrine of common law fraud and/or the Securities Act.

■ It is true that a party seeking rescission must promptly indicate this intention to the other party to the contract. Fichera v. Gording, 424 Pa. 404, 227 A.2d 642 (1967); Galati v. Potamkin Chevrolet Co., 198 Pa.Super. 533, 181 A.2d 900 (1962). In the instant case plaintiff knew that the 1969 financial figures of CGS were probably false as early as August 1970, but, despite this knowledge, he did not indicate any intent to seek rescission until December of that year. Under the circumstances of this case, however, plaintiff was an "insider" at CGS at the time of his receipt of this information. Furthermore, he was informed on two occasions that he could not seek or allow any alteration in his stock holdings until after a new restated financial statement was released to the public and signed a blocking statement to this effect. Plaintiff made his offer of rescission immediately after said report was made public and, under the facts of the instant case as presented for prelimi-

nary injunctive relief, this Court concludes that it is highly probable that plaintiff's demand for rescission was made as soon as practicable and was timely and that plaintiff will not be barred from seeking to rescind the contract under the doctrine of waiver as enunciated in Baumel v. Rosen, 412 F.2d 571 (4th Cir. 1969), cert. denied 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681 (1970), and Jones v. Costlow, 349 Pa. 136, 36 A.2d 460 (1944).

■ We also find that it is highly probable that plaintiff will be able to prove that his offer of tender was sufficient under Pennsylvania law to satisfy the requirement of common law fraud that:

> (A) party seeking rescission of a contract must return or offer to return what he has received under it, and thus put the other party as nearly as is possible in his situation before the contract * * *.

Sloane v. Shiffer, 156 Pa. 59, 64, 27 A. 67, 68 (1893). Moreover, plaintiff has certainly made out adequate tender under the Securities Exchange Act since no tender need be made pursuant to that Act until the time of filing the complaint. Chapman v. Dunn, 414 F.2d 153 (6th Cir. 1969); Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269 (10th Cir. 1957).

We also find that plaintiff is likely to suffer irreparable harm if equitable relief is not now granted. It is highly probable that the suppliers of Crowell will cease doing business with Crowell except on a cash in advance basis if the present management is replaced. Moreover, because of the antagonism between the parties it is conceivable that defendants may fire the management of Crowell even though no knowledgeable replacements are available, which action of course would act to the detriment of both parties. Finally, in the event this Court determines that the plaintiff is entitled to rescission, such a determination will be meaningless unless the Crowell division is preserved, and in view of the financial position of CGS it is en-

tirely possible that CGS may sell the assets of Crowell effectively nullifying plaintiff's remedy. Therefore, we find that irreparable injury will result if this court denied preliminary relief. The Court wishes to point out that it is sustaining defendants' objections to the testimony concerning the suppliers' statements to Adelman and Goodman, which were clearly hearsay, and has not considered those statements for the purpose of finding irreparable harm or in making any of the other findings in this case.

It is clear that the Court has the power to appoint a Receiver or Custodian in this case. This power is derived from our general and inherent equity power and the grant of authority under the Securities Act of 1933 (1933 Act) and the Securities and Exchange Act of 1934 (1934 Act). The basic consideration in appointing a receiver or a custodian is the necessity of protecting, conserving and administering property pending final disposition of a suit. Gordon v. Washington, 295 U.S. 30, 55 S.Ct. 584, 79 L.Ed. 1282 (1935); View Crest Garden Apartments v. United States, 281 F.2d 844 (9th Cir. 1960).

The interim protection of property fraudulently acquired, and in imminent jeopardy of loss, pending rescission is one of the classic instances where the appointment of a receiver or custodian is proper. Globe Solvents v. Nouskhajian, 148 Pa.Super. 202, 24 A.2d 687 (1942); Mintzer v. Arthur L. Wright & Co., 263 F.2d 823 (3d Cir. 1959). See generally, 45 Am.Jur., Receivers § 35 and cases cited therein.

We find the cases cited by defendant which deny a right to a receiver inapposite to the instant case since they concerned situations in which an entire corporation was sought to be put into the hands of a receiver. The reason for requesting the receivership, and therefore the test of its propriety in those cases, was that an obligation of the corporation was threatened because of mismanagement and/or financial uncertainty of the debtor corporation. It was to preserve a

fund out of which the obligation could be satisfied that a receiver and other preliminary relief was sought. E. g. Mintzer v. Arthur L. Wright & Co., 263 F.2d 823 (3d Cir. 1959); Maxwell v. Enterprise Wall Paper Mfg., 131 F.2d 400 (3d Cir. 1942). Such is simply not the case here.

Moreover, the Court deems it unnecessary to make any findings concerning the solvency of CGS for the reason that solvency is not a bar to the appointment of a custodian or receiver. As Judge Goodrich, writing for himself, Judge Biggs and Judge Maris in Maxwell v. Enterprise Wall Paper Mfg. Co., supra, stated:

" * * * it appears that far from being in danger of insolvency, the principal corporate defendant is a successful business enterprise and in a very sound financial position. This is not alone a conclusive ground for negativing a receivership for a receiver may, in an appropriate case, be appointed for a solvent concern. * * " 131 F.2d at 404.

However, although it is clear this Court has the power to appoint a receiver or custodian and grant other preliminary relief, in determining the appropriate relief we must balance the potential harm of such relief to the parties. Preliminary relief should not be granted where it would result in a risk of substantial harm to the defendant. Hambros Bank, Ltd. v. Meserole, 287 F. Supp. 69 (S.D.N.Y.1968); Kontes Glass Co. v. Lab Glass, Inc., 250 F.Supp. 193 (D.N.J.), aff'd 373 F.2d 319 (3d Cir. 1967); Fein v. Security Banknote Co., 157 F.Supp. 146 (S.D.N.Y.1957). Nor should it be granted where it would greatly interfere with the operation of a defendant's business. SEC v. Arco Industries, 1971 CCH Sec.L.Rep. 92,921 (S.D.N.Y. 1/18/71); Goldberg v. First Devonshire Corp., 1971 CCH Sec.L.Rep. 92,907 (S.D.N.Y. 12/29/70).

Using such a balancing test we cannot grant the preliminary relief as sought by plaintiff, since it would place

Crowell under the control of plaintiff, an adverse party with an obvious conflict of interest, and would create the risk of irreparable harm to CGS. Crowell Division has a net worth on the books of CGS of $2,100,000. It has an assigned value on the bank loan of $1,800-000 and is a division which CGS may sell to a third party. Impairment of this major asset would cause CGS great harm. Furthermore, since it is highly probable that plaintiff has a firm commitment from a third party to provide him with the funds to pay CGS for the Crowell Division, he may be lacking incentive at this time to operate the division more profitably. He may consider it to his advantage to discourage competing prospective buyers so that he would be in a better position to buy Crowell back at a lower price in the event this Court denies rescission. Any harm to the division from plaintiff's self interest will irreparably injure CGS.

There is another reason why this Court cannot appoint the Plaintiff as Receiver. CGS has a bank loan of $2,-765,000 secured by the assets of CGS including Crowell. Any impairment in the collateral value of CGS, including Crowell, or any impairment of the net worth of CGS including Crowell gives the bank the right to demand prepayment of the loan. CGS must, therefore, have the continued authority to supervise the division in order to protect its position with the bank. The value assigned to the Crowell Division in the bank loan is $1,800,000. This is over one-third the value of all CGS divisions. Appointing the plaintiff as the Receiver would not be to anyone's best interest. Furthermore, CGS has a clause in its loan agreement with the banks which provides that if a trustee or receiver is appointed for CGS or any of its divisions the banks can take control of the entire corporation.

Moreover, in determining the appropriate relief we must consider the three class actions by shareholders of CGS which are presently before this Court. Each alleges violations of the securities laws in connection with the purchase or sale of CGS stock on the basis of false or misleading statements, primarily in 1970, but also in 1969 and 1968. And no order we issue should unnecessarily prejudice their rights.

Finally, we must note that some relief is necessary because the parties are unable to reach any decisions on the management policy at Crowell. Since the first hearing in this matter on July 9, 1971, the attorneys for plaintiff and for CGS have been before us numerous times, by letters, telephone calls and in person, in their efforts to arrive at a Stipulation which would preserve the status quo of the parties until this case is heard on the merits. Their last series of discussions began in Chambers on Thursday, August 12, 1971, and counsel for the parties continued their conferences through the next day. The only decision which was reached was that the parties could not agree. It is apparent to us that the parties do not have the present ability to work together or to solve the daily crises which arise in the operation and management of a large corporation. CGS is experiencing financial difficulties; it needs Crowell to continue to operate at a profit. It is imperative that the management of CGS and of Crowell work harmoniously because it is obvious that if the Crowell division is not a financial success, it may destroy the entire corporate structure of CGS. And, by the same token, should CGS be faced with additional financial crises, there is no question but that this would bring about the failure of all its divisions, including Crowell. The need for flexibility in the cash flow between CGS and Crowell makes it impossible to fashion a specific order regulating the cash flow between them and dictates the necessity for a third party to mediate the financial disputes which are now taking place between the parties.

Therefore, in order to avoid irreparable harm to CGS and its share holders, but at the same time to preserve Crowell's assets and to keep Crowell operational pending a final trial on the merits,

we deem it necessary to appoint a Custodian to preserve Crowell and work effectively with both the management of Crowell and of CGS. This Custodian will be given the power to act as an arbitrator when disputes arise between Crowell and CGS and will have the responsibility of working in the best interests of both parties in this action. The primary responsibility of the Custodian will be to preserve the Crowell division as a viable business concern without inflicting harm on CGS, so that if rescission is deemed appropriate Crowell will remain in such financial condition as to make said relief meaningful. In view of the daily financial crises which have confronted both the Crowell division and CGS, the determination of the Custodian will require a constant weighing of the equities in order to preserve the Crowell division without inflicting financial harm on CGS until this Court makes a final determination after trial on the merits, which trial will be scheduled at an early date.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, and Section 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa. The parties are of diverse citizenship and the amount in controversy exceeds $10,000, exclusive of interest and costs.

2. The representations relied upon by plaintiff, both written and oral, appear to be material, false and misleading as those terms are construed under and violative of the Federal Securities Laws.

3. CGS is chargeable with knowledge of the falsity of the statements.

4. The misrepresentations referred to heretofore appear to constitute violations of §§ 12(2), 17 of the Securities Act of 1933, § 10 of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

5. The same misrepresentations appear to constitute the tort of fraud and deceit under the law of Pennsylvania.

6. Rescission is available under the Federal Securities Laws and at common law for fraud.

7. Formal tender, the actual production and counting out of consideration, is not required for the Court to order rescission as a remedy under the Securities and Exchange Act of 1934.

8. Legally sufficient tender at common law appears to have been made by the plaintiff and rejected.

9. It is highly probable that plaintiff will prevail upon final hearing on his claim for rescission.

10. If preliminary relief is not granted, there is a high probability of irreparable harm to the Crowell Division, thus, frustrating the remedy of rescission.

11. It is more likely than not that defendant, CGS, will suffer irreparable harm if the relief sought by plaintiff, namely that Adelman be appointed receiver or custodian, is granted, but will suffer no harm if an independent third party is appointed custodian to settle day-to-day disputes between CGS and the management of the Crowell division.

## ORDER

And now, this 26th day of August, 1971, it is hereby ordered and decreed that:

1. Defendant, their agents, employees, officers, directors and all others acting on their behalf be, and are hereby, enjoined and restrained until further Order of this Court from doing or causing or permitting to be done any act, transaction or business which will impair the financial condition, assets, credit, good name or trade secrets of the Crowell Division.

2. Plaintiff and all other employees of Crowell Division acting alone or on plaintiff's behalf be, and are hereby, enjoined and restrained until further Order of this Court from doing or causing or permitting to be done any act, transaction or business which will impair the financial condition, assets, cred-

it, good name or trade secrets of the Crowell Division.

3. Harold J. Conner, Esquire, is hereby appointed Custodian of all the assets, property, franchises, rights, privileges and interests of whatsoever kind of Crowell Division with the power to hold, demand, receive and collect all funds, assets and property belonging to Crowell, or in the hands of any debtor, agent, or depository of Crowell, and to account to the Court for the same.

(a) Said Custodian shall have the power and authority to settle all disputes between the management of CGS Scientific Corporation and the Crowell Division of CGS Scientific Corporation and said managements shall be bound by his decisions, which shall be final.

(b) Said Custodian is instructed to consider the best interests of CGS Scientific Corporation and its shareholders · as well as the Crowell Division in reaching his decisions; and is further instructed in reaching his decisions to bear in mind that Crowell is a division of CGS and not an independent corporate entity.

(c) Said Custodian shall strive at all times to preserve the integrity, good will and assets of the Crowell Division without impairing the financial condition of CGS.

(d) The Court directs all parties to this proceeding to cooperate fully with the Custodian to ensure efficient, economical and profitable operations at the Crowell Division, such an operation being to the benefit of all parties.

(e) Said Custodian is hereby authorized to employ any professional, secretarial and clerical assistants he deems necessary for the purposes of preserving the assets, property and interests of Crowell.

4. There will be no changes in the management of the Crowell Division as it existed on July 2, 1971 without the consent of the Custodian.

5. The management of Crowell Division is directed to keep the management of CGS Scientific Corporation informed of all significant changes in the operation or financial condition of Crowell; and is further directed to cooperate with CGS management, its agents and employees who came to the Crowell plant to investigate the condition of Crowell.

6. This Order shall remain in effect until final determination of this matter after a hearing on the merits.

7. This case shall proceed to final hearing and trial on the merits before this Court on Wednesday, October 27, 1971, at 10:00 A.M.

(a) All Discovery shall be completed by Friday, October 15, 1971.

(b) A Pre-trial Conference shall be held in Chambers on Friday, October 22, 1971 at 2:00 P.M. A Pre-trial Order shall be completed pursuant to our Standing Order and must be submitted at the Pre-trial Conference.

## MEMORANDUM AND ORDER

In this matter the plaintiff, Herbert Adelman, seeks rescission of an allegedly fraudulent contract of sale, whereby the Crowell Corporation, of which Mr. Adelman was a 20% owner, was sold to the defendant CGS Scientific Corporation. An Order of this Court, entered on August 26, 1971, preliminarily enjoined both the plaintiff and the defendant CGS "from doing or causing or permitting to be done any act, transaction or business which will impair the financial condition, assets, credit, good name or trade secrets of the Crowell Division", provided for the appointment of a Custodian of the assets, property, franchises, rights, privileges and interests of the Crowell Division, and granted to the Custodian certain powers for the purpose of maintaining the status quo pending a final determination.

On August 30, 1971, defendant CGS filed a motion requesting this Court to amend its Order of August 26, 1971, by deletion of paragraph number 3 insofar as that part of said Order appointed a Custodian of the assets of the Crowell Division, but preserving all of the remaining powers conferred on this Cus-

todian and changing his designation from Custodian to Arbitrator. The motion alleges that the naming of a Custodian of the assets of the Crowell Division would place CGS in apparent default under the terms of certain outstanding indentures in the amount of $2,449,000. The terms of this indenture were not placed in evidence during the hearings for the preliminary injunction. Oral argument was heard on this motion on August 31, 1971, at which time CGS placed in the record the terms of said Indenture, which provides in pertinent part:

Section 501. Events of Default.

*"Event of Default"*, wherever used herein means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

\*　　\*　　\*　　\*　　\*

(4) the entry of a decree or order by a court having jurisdiction in the premises adjudging the Company a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Company under the Federal Bankruptcy Act or any other applicable Federal or State law, *or appointing a receiver, liquidator, assignee, trustee, sequestrator (or other similar official)* of the Company or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and *in effect for a period of 60 consecutive days* \* \* \*. (emphasis added)

CGS claims that the appointment of the Custodian has placed defendant CGS in apparent default under the above quoted sections of the Indenture. CGS argues that "[s]ince all of the officials named in this clause are officials who take title to the assets or part of the as-

sets of the company, an official called a 'custodian' who takes title to the assets of Crowell Division is on the face of the Indenture a 'similar official.' "

On the basis of defendant's title argument, it is questionable whether a Custodian does indeed fit into the above category because under ordinary circumstances a Custodian merely has the care or possession of a res. Bank of Commerce v. Hartford Accident & Indemn. Co., 164 F.2d 149 (5th Cir. 1947). Moreover, it is possible as plaintiff argues that the appointment of a Custodian is not an event of default under the above Indentures because these particular terms in the Indenture refer only to such officials when appointed in an insolvency proceeding. And, of course, this is not an insolvency proceeding since, as we stated in our Opinion of August 26, 1971, we made no determination as to the solvency or insolvency of CGS. However, even though plaintiff's interpretation is possible, litigation might arise and cause severe harm to CGS.

Since the purpose of this Court's original Order was not only to preserve the assets of Crowell and to keep the Crowell Division operational, but also to avoid irreparable harm to CGS and its shareholders pending a final trial on the merits of this case, we deem some amendment to our Order desirable. In view of this determination, we note from the above quoted language of the Indenture that any order appointing such "other similar official", even if a Custodian could be so construed, must remain "in effect for a period of 60 consecutive days" before such appointment becomes an event of default which can be acted upon by either the Trustee of the Indenture or by the bondholders. Therefore, in order to ensure that our Order is not interpreted as an event of default under the Indenture and to avoid any possibility of irreparable injury to either the plaintiff or the defendant, CGS, in this matter, the Court hereby amends its Order of August 26, 1971, by specifically providing that it shall remain in effect only until midnight of

October 23, 1971, the 59th day after its issuance. At the time of the Pre-trial Conference on October 22, 1971, this Court will consider any and all steps which may then be necessary for the maintenance of the status quo in this matter pending final determination after the trial of this case on the merits, which trial has been specially listed for October 27, 1971.

Accordingly, the following Order is entered:

### ORDER

And now, to wit, this 14th day of September 1971, it is hereby ordered and decreed that:

1. The Order of this Court in the above-captioned matter dated August 26, 1971, shall be amended by deleting therefrom paragraph number 6, which reads:

   "6. This Order shall remain in effect until final determination of this matter after a hearing on the merits."

and inserting in place thereof a new paragraph 6 which shall read:

   "6. This Order shall remain in effect until midnight October 23, 1971."

2. Security shall be filed by plaintiff in the sum of Twenty-Five Thousand ($25,000.00) Dollars.